**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 1:26-cv-20556**

ELIZABETH MADDEN, individually and
as co-trustee of the Elizabeth Ludwig
Madden Revocable Trust,

     *Plaintiff,*

v.

THE NORTHERN TRUST COMPANY, a
foreign banking corporation and co-trustee
of the Elizabeth Ludwig Madden
Revocable Trust,

     *Defendant.*

_____/

**COMPLAINT WITH DEMAND FOR JURY TRIAL**

Plaintiff Elizabeth Madden ("Mrs. Madden"), individually and as co-trustee of the Elizabeth Ludwig Madden Revocable Trust, sues The Northern Trust Company ("Northern Trust"), and alleges as follows:

**INTRODUCTION**

1.    This case is about how Northern Trust, acting through its Vice President, stole millions of dollars over several years from the elderly granddaughter of the founder of its Florida operations. Through this action Mrs. Madden is seeking at least $35 million in damages from Northern Trust.

2.    "Northern Trust" is a misnomer. The bank has proven itself to be anything but trustworthy and betrayed the very fiduciary duties it claims to uphold. While marketing itself as a guardian of assets for wealthy families nationwide, it empowered Christopher Walters ("Vice President Walters"), a Northern Trust Vice President, agent, and Senior Fiduciary Relationship Advisor, over at least a ten-year period to steal

1

millions of dollars from Elizabeth Madden. Mrs. Madden is a vulnerable woman in her eighties who entrusted Northern Trust with her $20 million legacy trust. The theft happened under Northern Trust's watch, who allowed Vice President Walters to steal millions while Northern Trust collected millions in fees. This case is about elder abuse committed by Northern Trust and Vice President Walters. There are other Northern Trust victims as well.

### FACTUAL ALLEGATIONS

3.     Mrs. Madden was born and raised in this community, as were her three children. While she is a South Florida native, Northern Trust is not.  It is a federally chartered, Chicago-based trust bank that originally had wealthy Midwesterner clientele.

4.     In 1971, Northern Trust got its foothold in the South Florida financial market by acquiring Security Trust Company, the bank that Mrs. Madden's grandfather founded in the 1930s. This operation was Northern Trust's first location outside of Illinois, and Florida is now its second largest U.S. market.

5.     Mrs. Madden is the granddaughter of the founder of Security Trust Company. To this day, the Security Trust acquisition remains significant in the Northern Trust lore; it is prominently highlighted in Northern Trust's "Our History" section on its website:



6.     After her family's bank was sold to Northern Trust, Mrs. Madden, then a young woman, kept her revocable trust with Northern Trust, believing Northern Trust would uphold the same standards of honesty, stewardship, reliability, and personal service that defined Security Trust Company (the bank started by her grandfather). She appointed Northern Trust as co-trustee of her approximately $20 million legacy trust (the "Trust").

7.     Pursuant to the Trust agreements for her revocable Trust, Mrs. Madden served as a grantor, co-trustee, and beneficiary, while Northern Trust acted as custodian of the Trust corpus, as well as the administrator and co-trustee of the Trust estate.

8.     Northern Trust, by serving as co-trustee, owed Mrs. Madden several fiduciary duties including, without limitation, a duty of loyalty, a duty to safeguard trust assets, a duty to properly oversee the administration of the Trust, a duty to inform and account, and a duty to act prudently and reasonably in administering and delegating administrative responsibilities relating to the Trust. Under this relationship, Mrs. Madden and the Trust estate relied on Northern Trust as a fiduciary to protect and administer the Trust.

9.     Northern Trust, as co-trustee to Mrs. Madden and the Trust, also owed both the highest fiduciary duty to act exclusively in their best interests. This duty encompassed unwavering obligations of loyalty, prudence, good faith, accountability, and oversight.

10.     As a fiduciary, and to protect Mrs. Madden's Trust estate, Northern Trust had an obligation to institute prudent internal procedures designed to protect the large sum of assets held within the Trust corpus.

11.     Northern Trust's website claims to be "Your Most Trusted Advisor," claiming to "earn that trust through our founding principles of service, expertise and integrity. The website states that its mission is to "provide exceptional service for our clients, communities and colleagues."

12.     Integrity is purportedly important at Northern Trust: "in all things, we act with the highest ethics, utmost honesty and unfailing reliability." This website catch phrase was not put into practice for Mrs. Madden. Northern Trust exhibited a disregard for ethics, and the only thing that was reliable for Mrs. Madden was the reliability of the dishonesty of Vice President Walters.

## Our Founding Principles

Since 1889, when Northern Trust was founded in Chicago, we have aligned our efforts with our three guiding Principles That Endure: Service, Expertise, and Integrity. Together, they reflect the three cornerstones of business conduct which we strive to instill in our employees, whom we call partners, and to provide to our clients and the communities we serve worldwide.  These founding principles speak to the longstanding, embedded values here at Northern Trust. They serve as a code that has been continuously reinforced through words and actions across the company.



**Service**
Our mission is to provide exceptional service for our clients, communities and colleagues.



**Integrity**
In all things, we act with the highest ethics, utmost honesty and unfailing reliability.



**Expertise**
We continuously focus on expanding our knowledge and capabilities to serve our clients.

13.     The focus on expertise on the website also seems misplaced, since the expertise exhibited by Northern Trust Vice President Walters was his increased adeptness at stealing money from clients' trust accounts.

14.     Instead of providing qualified fiduciary oversight and the premium service Northern Trust purports to give its clients, Mrs. Madden was ministered by Vice President Walters, who was uneducated by industry norms and clearly unsupervised. His employment prior to and during his time at Northern Trust was as a personal trainer.

15.     Northern Trust hired Vice President Walters in 2000 as an "Associate," which is an assistant to an officer. Eventually he was promoted to Vice President.

16.     Under Northern Trust's negligent blind eye, Vice President Walters misused his position of trust and took advantage of Mrs. Madden's age and reliance on

Northern Trust to divert substantial sums from her trust estate. He used stolen trust assets to fund failed business ventures such as his failed gym, to make monthly rental payments on his failed gym, to satisfy personal credit card debts, and to support his lifestyle, all while acting under Northern Trust's authority. The illicit behavior persisted for more than a decade.

17.    Northern Trust did not merely fail to prevent Vice President Walters's misconduct; it facilitated it. The sheer extent of the fraudulent transfers and unauthorized transactions demonstrates that Northern Trust lacks the crucial safeguards, systems, management, and regulatory compliance procedures necessary to prevent financial theft by its employees.

18.    Northern Trust failed to effectuate and implement its own internal controls designed to safeguard Mrs. Madden from Vice President Walters's treachery. Moreover, Northern Trust failed to prudently supervise Vice President Walters in his administration of Mrs. Madden's Trust.

19.    Vice President Walters, as evidenced by his daily emails and texts to Mrs. Madden, ingratiated himself with her. In the thousands of emails Vice President Walters sent Mrs. Madden, he used his Northern Trust email, caw8@ntrs.com. He texted Mrs. Madden obsessively to the point she became a victim of his abuse.

20.    Vice President Walters even created what he called "girl time," during which he scheduled hour-long calls with Mrs. Madden to insincerely ask about her well-being, inquire about her family life, and cultivate a contrived personal bond with her.

21.    It was clear to Vice President Walters that Mrs. Madden had excellent recall of the past but not the recent past, and it was readily apparent that due to the infirmities attendant to advanced age, she was lacking in stamina, easily tired, and often confused.

22.    As a Vice President of Northern Trust, Walters orchestrated an extensive, relentless, and grossly predatory embezzlement scheme. The elder abuse and elder financial exploitation went on for many years, undetected or ignored by Northern Trust.

23.    Mrs. Madden was not Northern Trust and Vice President Walters's only victim. Mrs. Madden, whose maiden name is Elizabeth Ludwig, had an older brother, Robert Ludwig, Jr. ("Bobby Ludwig"). Bobby Ludwig died in 2012 at the age of 74. Walters was also Bobby Ludwig's relationship manager, from around 2004 to the time of his death in 2012.

24.    Vice President Walters, Northern Trust's agent, stole from the elderly, ailing Bobby Ludwig, an aging alcoholic who suffered from paralysis, stroke, and severe Alzheimer's disease and for many years was confined to a wheelchair. Vice President Walters had almost unfettered access to the late and vulnerable Bobby Ludwig's account. Walters was largely in charge of Bobby Ludwig's financial affairs, even writing checks to pay Bobby Ludwig's bills.

25.    In February 2025, when the theft of Mrs. Madden's funds were discovered by an employee of another bank, Mrs. Madden told Northern Trust executives that they should examine Bobby Ludwig's revocable trust and other accounts since it made sense that if Walters stole from Mrs. Madden, he had stolen from her very infirm brother.

26.    Northern Trust, always inscrutable, never commented as to whether or not they would look at Bobby Madden's revocable trust account or his other accounts to find out whether the sticky-fingered Walters had also helped himself to those funds.

27.    Robert Ludwig III ("Rob Ludwig") was Bobby Ludwig's only child and his beneficiary. Rob Ludwig has a trust funded by the proceeds of his late father's trust.

28.     Rob Ludwig, in approximately early 2025, decided to move his funds from Northern Trust to another financial institution where he felt there was less likelihood that his money would be stolen. The transfer was set to take place in late September or early October 2025.

29.     On September 24, 2025, approximately nine months after Northern Trust learned of their employee's theft from Mrs. Madden's revocable trust and approximately nine months after Northern Trust executives were informed they should investigate whether Bobby Ludwig's account had been pillaged, a Northern Trust Senior Vice President, told Rob Ludwig what everyone in the Ludwig/Madden family suspected – Walters had stolen from Bobby Ludwig's revocable trust.

30.     The Northern Trust Senior Vice President, in a cryptic uninformative email, told Rob Ludwig that Northern Trust had "discovered two unauthorized transactions" from Bobby Ludwig's revocable trust. While the words "stole" or "theft" were not used, the Northern Trust Senior Vice President, writing on behalf of Northern Trust, stated that the "unauthorized transactions" were for "$30,000 each in February and April of 2009."

31.     Northern Trust did not address when they "discovered" the theft, whether they had been sitting on the information until they were forced to inform Rob Ludwig as he departed Northern Trust, the scope of the investigation, and whether further investigation would reveal what is almost certainly additional theft from Bobby Ludwig's account, the account to which Rob Ludwig is the beneficiary.

32.     Northern Trust, in much the same way they sought to "contain," manage, and conceal information from Mrs. Madden, have stonewalled Rob Ludwig about their rogue employee, Vice President Walters. Rob Ludwig's requests for additional

7

information regarding trust and bank account activity, which is likely to reveal vastly more theft, have been ignored.

33.    Since 2011, Vice President Walters personally executed each of Mrs. Madden's Trust agreements on Northern Trust's behalf, further memorializing both Walters's and Northern Trust's acceptance of their roles and responsibilities as fiduciary and co-trustee to Mrs. Madden's Trust:

**NORTHERN TRUST, NA** does hereby acknowledge receipt of the foregoing Elizabeth Ludwig Madden Second Amended and Restated Revocable Trust Agreement (the "Agreement") and agrees to serve as a Co-Trustee under the Agreement.

**IN WITNESS WHEREOF**, this Acknowledgment and Agreement by Co-Trustee is executed this _1st_ day of _____July_____, 2011.

Witnesses

NORTHERN TRUST, NA, *as Co-Trustee*

By: _____

Title _2nd VP_

***

THE NORTHERN TRUST COMPANY, Co-Trustee

By: _____ (SEAL)
Name: _Christopher Walters_
Title: _Vice President_

***

THE NORTHERN TRUST COMPANY, Co-Trustee

By: _____ (SEAL)
Name: _Christopher Walters_
Title: _Vice President_

8

34.     In 2023, Northern Trust promoted Vice President Walters to Senior Fiduciary Relationship Advisor. He also continued to hold the title of Vice President.

35.     By appointing and promoting Walters as a Vice President, Senior Fiduciary Relationship Advisor, and account manager, Northern Trust aided and enabled Vice President Walters to embezzle millions of dollars from Mrs. Madden's Trust to bankroll his gym and fund his lifestyle through credit card charges unknowingly paid by Mrs. Madden.

36.     Northern Trust is a financial institution authorized to conduct trust business within the meaning of Chapter 660, Florida Statutes, and serves as trustee of the Trust, a fiduciary account as defined by Chapter 660. Northern Trust is also governed by the Florida Trust Code, Chapter 736, Florida Statutes, including the acceptance and administration of fiduciary accounts through its trust department.

37.     At all relevant times, Northern Trust accepted appointment and acted as trustee of the Trust, thereby undertaking statutory and common-law fiduciary duties of loyalty, prudence, segregation of assets, implementation of adequate internal controls, and proper selection and supervision of trust-department personnel, including duties imposed by Chapter 660 and by Part VIII of the Florida Trust Code.

38.     As a Chapter 660 fiduciary and  trustee under Chapter 736, Northern Trust had a statutory duty, among other duties, to keep Trust property separate from its own property and to maintain distinct books and records for the Trust, to take control of and protect Trust property, to employ systems of internal control sufficient to safeguard fiduciary assets, and to ensure that fiduciary funds were not misappropriated, diverted, or exposed to unauthorized use by bank officers or employees.

39.     Northern Trust further owed duties under Chapters 660 and 736 and Florida common law to staff its trust department with qualified, honest personnel; to

administer the Trust in good faith and solely in the interests of the beneficiaries; to supervise its officers and employees engaged in trust administration; to keep adequate records; and to institute and enforce procedures reasonably designed to prevent, detect, and promptly remediate any misappropriation of fiduciary funds.

40.     At all relevant times, Vice President Walters's responsibilities included working with clients of Northern Trust's trust department in connection with the administration of trusts, such as the Trust, and he was thereby involved in the exercise of Northern Trust's fiduciary functions as trustee.

41.     Northern Trust entrusted Vice President Walters with access to Trust funds and with authority to initiate and approve transactions affecting the Trust's accounts, acting within the scope of his employment and apparent authority on behalf of Northern Trust as a vice president of the financial institution. Northern Trust held Vice President Walters out as an officer participating in the administration of the Trust, a competent and trustworthy fiduciary, and induced Plaintiff to rely on his honor and advice as a vetted representative of Northern Trust.

42.     While serving in that capacity, Vice President Walters intentionally stole and misappropriated substantial Trust funds by initiating unauthorized transfers and withdrawals from the Trust's accounts for his own personal benefit and for purposes unrelated to the Trust. Northern Trust's deficient internal controls, recordkeeping, and supervisory practices permitted this embezzlement to occur and continue undetected for an extended period, in violation of its duties to protect and account for trust property under the Florida Trust Code.

43.     Among other nefarious schemes, Vice President Walters exploited Northern Trust's ill-conceived process for seeking approval for disbursements from a trust; rather than requiring a process whereby a local fiduciary officer must approve

disbursements from the Trust, Vice President Walters took advantage of Northern Trust's flawed and inadequate system in which such approvals were handled through back office personnel outside of Florida, and in which it was likely that a different person would receive each request for approval, thereby allowing Vice President Walters to prolong his pattern of pilfering Trust assets without timely detection or intervention by Northern Trust.

44.     Northern Trust breached its fiduciary and statutory duties under Chapters 660 and 736 by failing to properly segregate and safeguard Trust assets, by failing to implement and enforce adequate internal controls and dual-control procedures over fiduciary funds, by failing to reconcile and review Trust transactions in a timely and competent manner, by failing to provide accurate and complete information and accountings to the beneficiaries, and by failing to detect and prevent Vice President Walters's repeated misappropriations.

45.     Northern Trust is vicariously liable for Vice President Walters's misconduct under principles of agency and respondeat superior because Walters committed the above-described acts while cloaked with the authority and access that Northern Trust conferred upon him as a trust-department vice president, and because Vice President Walters's ability to steal Trust funds arose directly from Northern Trust's entrustment of fiduciary and trust-administration functions to him.

46.     Northern Trust is also directly liable for Rob Ludwig's losses and the breaches of duties by its officer, Vice President Walters, because of its negligent supervision and negligent failure to adopt basic trust accounting controls.

47.     These stolen funds should have been invested prudently. Because they were stolen, Mrs. Madden and other Trust beneficiaries were deprived of benefitting from the Trust's expected capital growth – lost opportunities.

48.     Northern Trust ratified Vice President Walters's misconduct by accepting the benefits of his actions and representations as Northern Trust's vice president and agent, including, without limitation, the continued collection of more than one million dollars in fees from Mrs. Madden for the administration of her trust account.

49.     In the Fall of 2024, for circumstances undisclosed to Mrs. Madden, Walters was told by Northern Trust that his position had been eliminated. Upon information and belief, Northern Trust offered Vice President Walters a one-year salary package, contingent upon him signing a release. It is unclear whether Vice President Walters signed the release.

50.     Following his departure from Northern Trust, Vice President Walters continued his daily communications with Mrs. Madden until December 2024, when she, not Northern Trust, discovered that Vice President Walters had failed to make charitable contributions from her trust as she had requested earlier in the year, which caused tax implications for her.

51.     In January 2025, Mrs. Madden decided to move her trust to another financial institution. In February 2025, during the routine onboarding of Mrs. Madden to the new institution, the theft, fraud and other illicit behavior which occurred at Northern Trust over a period of more than a decade was discovered by an employee of the new institution.

52.     Routine questioning and cursory analysis revealed years of theft that Northern Trust failed to uncover. Northern Trust never caught on to the fraud and theft.

53.     Northern Trust continued the elder exploitation and breach of fiduciary duties even after Walters left. Only after the fraud was discovered by the new co-trustee of Mrs. Madden's revocable trust did Northern Trust take any action. The action was to protect Northern Trust, not Mrs. Madden.

54.    Northern Trust's Chicago-based Associate General Counsel, and other Northern Trust executives hired outside counsel to protect Northern Trust. The fact that Northern Trust found it necessary to hire an outside law firm to deal with the situation was never mentioned to Mrs. Madden, despite Northern Trust's fiduciary duty towards Mrs. Madden. Instead, Mrs. Madden was asked to sign a "statement," prepared by Northern Trust lawyers or lawyers representing Northern Trust. The document was ostensibly drafted to be presented to law enforcement, even though Mrs. Madden, not Northern Trust, is the victim, and no such statement would be required for a law enforcement presentation. The statement placed all blame for the shameful series of events on Vice President Walters to absolve Northern Trust of liability or accountability.

55.    The "statement" was not authored by Mrs. Madden but was drafted by Northern Trust's legal team in her first-person voice, creating the false impression that she had written and endorsed it herself. Northern Trust once again exploited its fiduciary position in an attempt to manipulate an elderly client into minimizing Vice President Walters's theft and downplaying Northern Trust's role in the embezzlement scheme.

56.    Northern Trust attempted to present the document to Mrs. Madden under the pretext that it was required for law enforcement purposes, framing the issue as one of legal compliance. However, as an international bank represented by sophisticated counsel, Northern Trust knew that the document was unnecessary, that law enforcement would insist on speaking directly with Mrs. Madden, and that the purpose of having her sign the self-serving document was to deflect blame from Northern Trust, not to assist law enforcement, who may have been investigating Vice President Walters's criminal conduct.

57.    Had Northern Trust's manipulation of its 81-year-old client succeeded, Mrs. Madden's adoption of Northern Trust's narrative, written for her by Northern Trust lawyers, would have allowed Northern Trust to piously contend that Mrs. Madden put full blame on

Vice President Walters and exonerated Northern Trust. This would have effectively sidelined Mrs. Madden's interests while Northern Trust positioned itself as the only victim.

58.     Northern Trust stole millions from Mrs. Madden, then attempted to steal her victimhood.

59.     Northern Trust executives, including its Chicago-based Associate General Counsel, intended on flying to Mrs. Madden's home on Good Friday, 2025, to persuade her to sign the Northern Trust-manufactured, lawyer-written statement. Northern Trust did not anticipate that others would intervene to disrupt their efforts and ensure that Mrs. Madden obtained the advice of independent legal counsel.

60.     This action arises directly from Northern Trust's failure to discharge its fiduciary obligations and the resulting harm to Mrs. Madden's trust.

**PARTIES**

61.     At all times material hereto, Mrs. Madden was *sui juris*, a citizen of Georgia. Mrs. Madden was the beneficiary, grantor, and co-trustee to the Elizabeth Ludwig Madden Revocable Trust (the "Trust"), the corpus of which was custodied, located, and administered in Miami-Dade County, Florida, at and by The Northern Trust Company.

62.     Defendant Northern Trust is a regulated fiduciary bank incorporated in Illinois, with its principal place of business in Chicago, Illinois. At all material times hereto, Northern Trust offered trust administration and financial services from its office located in Miami-Dade County, Florida. Moreover, Northern Trust acted as co-trustee to and custodied and administered the corpus of the Elizabeth Ludwig Madden Revocable Trust in Miami-Dade County, Florida.

63.     Northern Trust's employee, vice president, and agent, Vice President Christopher Walters, executed trust agreements for the Trust on behalf of Northern Trust in Miami-Dade County, Florida, which memorialized and reaffirmed Northern Trust's status

14

as co-trustee and fiduciary to Mrs. Madden's Trust.

64.     Furthermore, Vice President Walters misappropriated assets from Mrs. Madden's Trust from Miami Dade County, Florida, while operating in his capacity as an employee, vice president, and agent of Northern Trust, and while administering its obligations as co-trustee.

## JURISDICTION AND VENUE

65.     The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332, because it is between citizens of different states and Mrs. Madden is seeking in excess of $35 million in damages from Northern Trust (exclusive of interest and costs), meaning that the matter in controversy far exceeds the jurisdictional minimum of $75,000.

66.     In addition, jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1338 because Mrs. Madden's claim for violations of the Computer Fraud and Abuse Act ("CFAA") under 18 U.S.C. § 1030 arises under federal law.

67.     Venue is proper because the Trust corpus was and is located in Miami-Dade County, Florida, as the Trust estate was custodied and administered by Northern Trust, which maintained the relevant trust accounts and fiduciary services through its office branch located in Miami-Dade County, Florida. Moreover, this cause of action accrued in Miami-Dade County, Florida, because Northern Trust's vice president, Walters, misappropriated Trust assets in Miami-Dade County, Florida.

68.     The Court has personal jurisdiction over Northern Trust because it engages in substantial and not isolated business activity in the State of Florida, such that it is regularly doing business in Florida, including the activities that are the subject matter of this action. Northern Trust also committed a tortious act in Florida when its vice president, employee, and agent, Vice President Walters, misappropriated Trust assets from Northern Trust's office in Miami-Dade County, Florida.

15

COUNT 1

CIVIL EXPLOITATION OF A VULNERABLE ADULT
(FLA. STAT. § 415.1111)

69.     Mrs. Madden incorporates Paragraphs 1 through 68 as though fully set forth herein.

70.     Mrs. Madden brings this claim in her individual capacity as grantor, beneficiary, and/or settlor to the Trust.

71.     Under Fla. Stat. § 415.1111, a vulnerable adult who has been exploited has a cause of action against any perpetrator and may recover actual and punitive damages for such exploitation.

72.     At all relevant times hereto, Mrs. Madden was a victim and vulnerable adult, as she is and was a person 18 years of age or older whose ability to perform the normal activities of daily living or to provide for her own care or protection was impaired due to the infirmities of aging.

73.     At all relevant times hereto, Vice President Walters acted as a vice president and officer of Northern Trust. Vice President Walters's conduct therefore constitutes the conduct of Northern Trust itself.

74.     At all relevant times hereto, Northern Trust, through its vice president, stood in a position of trust and confidence with Mrs. Madden, a vulnerable adult, and knowingly, by deception or intimidation, obtained or used  Mrs. Madden's funds, assets, or property with the intent to permanently deprive a vulnerable adult of the use, benefit, or possession of the funds, assets, or property, for the benefit of someone other than Mrs. Madden.

75.     Northern Trust, through Vice President Walters, exploited Mrs. Madden by breaching its fiduciary relationship with her.

76.     The acts and conduct of Northern Trust, as alleged above, constitute civil

exploitation of a vulnerable adult in violation of Fla. Stat. § 415.1111.

77.     Northern Trust, through its vice president, engaged in intentional misconduct because it had actual knowledge of the wrongfulness of its conduct and the high probability that injury or damage would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury and/or damage to Mrs. Madden, the Trust, and its beneficiaries.

78.     Northern Trust, through its vice president, had a specific intent to harm Mrs. Madden, and Northern Trust's conduct in fact harmed Mrs. Madden.

## COUNT 2

### VICARIOUS LIABILITY FOR CIVIL EXPLOITATION OF A VULNERABLE ADULT
### (FLA. STAT. § 415.1111)

79.     Mrs. Madden incorporates Paragraphs 1 through 68 as though fully set forth herein.

80.     Mrs. Madden brings this claim in her individual capacity as grantor and beneficiary and/or settlor to the Trust.

81.     Under Fla. Stat. § 415.1111, a vulnerable adult who has been exploited has a cause of action against any perpetrator and may recover actual and punitive damages for such exploitation.

82.     At all relevant times hereto, Mrs. Madden was a victim and vulnerable adult, as she is and was a person 18 years of age or older whose ability to perform the normal activities of daily living or to provide for her own care or protection was impaired due to the infirmities of aging.

83.     At all relevant times hereto, Walters stood in a position of trust and confidence with a Mrs. Madden, a vulnerable adult, and knowingly, by deception or intimidation, obtained or used a Mrs. Madden's funds, assets, or property with the intent

to permanently deprive a vulnerable adult of the use, benefit or possession of the funds, assets or property for the benefit of someone other than Mrs. Madden.

84.     Vice President Walters, in his capacity as a Northern Trust Vice President, exploited Mrs. Madden by breaching his fiduciary relationship with her.

85.     The acts and conduct of Vice President Walters as alleged above in the Complaint constitute civil exploitation of a vulnerable adult in violation of Fla. Stat. § 415.1111 for which Northern Trust is vicariously liable.

86.     At all relevant times hereto, Vice President Walters violated Fla. Stat. § 415.1111 during the course and scope of his employment as an agent and/or employee of Northern Trust. Northern Trust is consequently vicariously liable for Vice President Walters's misconduct and resultant damages.

87.     At all relevant times hereto, Northern Trust put Vice President Walters in a position that enabled Vice President Walters as an agent of Northern Trust to exploit Mrs. Madden while apparently acting within his authority.  Mrs. Madden was justified in relying on Walters's authority, given the circumstances.

88.     Upon information and belief, Northern Trust knowingly condoned, ratified, or consented to such conduct.

89.     Upon information and belief, Northern Trust actively and knowingly participated in the theft of Mrs. Madden's Trust estate because Vice President Walters acted as a managing agent with substantial authority and discretion on behalf of Northern Trust.

90.     Northern Trust's conduct amounts to gross negligence because its misconduct was so reckless that it constitutes a conscious disregard or indifference to the safety and rights of Mrs. Madden, which contributed to the loss, damage, and/or injury

to Mrs. Madden.

91.     Vice President Walters engaged in intentional misconduct because he had actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury and/or damage to Mrs. Madden, the Trust, and its beneficiaries.

92.     Vice President Walters had a specific intent to harm Mrs. Madden, and Walters's conduct did in fact harm Mrs. Madden.

### COUNT 3

### FRAUD

93.     Mrs. Madden incorporates Paragraphs 1 through 68 as though fully set forth herein.

94.     Mrs. Madden brings this claim in her capacity as beneficiary, grantor and/or settlor, and co-trustee of the Trust.

95.     At all relevant times hereto, Walters acted as a vice president and officer of Northern Trust. Walters conduct therefore constitutes the conduct of Northern Trust itself.

96.     Based on the acts and conduct alleged above in this Complaint, Northern Trust, through Vice President Walters, made false statements concerning specific material facts that it knew were false with an intention that the representation induce Mrs. Madden to rely on it, which consequently injured Mrs. Madden.

97.     Vice President Walters represented that he would act in Mrs. Madden's best financial interests. He represented that he would undertake investment strategies to protect the Trust's assets. He represented that he had knowledge of the financial

market and its trends. He represented that he would be transparent in all transactions and prioritize the Trust's wellbeing over his own, while acting with loyalty and good faith.

98.     Vice President Walters made these representations with knowledge of their falsity.

99.     Mrs. Madden reasonably and justifiably relied on those representations, which led to extensive financial abuse.

100.    Vice President Walters committed fraud in several ways, including but not limited to:

  a.      Opening an undetermined number of credit card accounts and paying his credit card debt with funds taken directly from the Trust.

  b.      Transferring funds from the Trust to a shopping center landlord where he rented space to operate his cross fit gym.

  c.      Transferring funds directly to the gym he owned.

  d.      Charging investment management fees during the very years the fraud was conducted.

101.    Northern Trust, through its vice president, engaged in intentional misconduct because it had actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury and/or damage to Mrs. Madden, the Trust, and its beneficiaries.

102.    Northern Trust, through Vice President Walters, had a specific intent to harm Mrs. Madden, and Northern Trust's conduct did in fact harm Mrs. Madden.

## COUNT 4

## VICARIOUS LIABILITY FOR FRAUD

103.   Mrs. Madden incorporates Paragraphs 1 through 68, as though fully set forth herein.

104.   Mrs. Madden brings this claim in her capacity as beneficiary, grantor and/or settlor, and co-trustee of the Trust.

105.   Based on the acts and conduct alleged above in this Complaint, Vice President Walters made false statements concerning specific material facts that he knew were false with the intention that the representations would induce Mrs. Madden to rely on them, which consequently injured Mrs. Madden.

106.   Vice President Walters, during the course and scope of his employment as an agent and/or employee of Northern Trust, represented that he would act in Mrs. Madden's best financial interests. He represented that he would undertake investment strategies to protect the Trust's assets. He represented that he had knowledge of the financial market and its trends. He represented that he would be transparent in all transactions and prioritize the Trust's wellbeing over his own, while acting with loyalty and good faith.

107.   Vice President Walters made these representations with knowledge of their falsity.

108.   Mrs. Madden reasonably and justifiably relied on those representations, which led to extensive financial abuse.

109.   Rather than act as fiduciary, Vice President Walters committed fraud in several ways, including but not limited to:

a.   Opening an undetermined number of credit card accounts and paying his credit card debt with funds taken directly from the Trust.

b.   Transferring funds from the Trust to a shopping center landlord where he rented space to operate his gym.

c.    Transferring funds directly to the gym he owned.

d.    Charging investment management fees during the very years the fraud was conducted.

110.    Based on the acts and conduct alleged above in this Complaint, Vice President Walters committed fraud during the course and scope of his employment as an agent and/or employee of Northern Trust. Northern Trust is consequently vicariously liable for Vice President Walters's misconduct and resultant damages.

111.    At all relevant times hereto, Northern Trust put Vice President Walters in a position that enabled Walters as an agent of Northern Trust to exploit Mrs. Madden while apparently acting within his authority. Mrs. Madden was justified in relying on Vice President Walters's authority given the circumstances.

112.    Upon information and belief, Northern Trust knowingly condoned, ratified, or consented to Vice President Walters's conduct.

113.    Northern Trust's misconduct amounts to gross negligence because it was so reckless that it constitutes a conscious disregard or indifference to safety and rights of Mrs. Madden, which contributed to the loss, damages, and/or injury to Mrs. Madden.

114.    Walters engaged in intentional misconduct because he had actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury and/or damage to Mrs. Madden, the Trust, and its beneficiaries.

115.    Walters had a specific intent to harm Mrs. Madden, and Walters's conduct did in fact harm Mrs. Madden.

## COUNT 5

### BREACH OF FIDUCIARY DUTY

116.     Mrs. Madden incorporates Paragraphs 1 through 68 as though fully set forth herein.

117.     Mrs. Madden brings this claim in her capacity as beneficiary, grantor and/or settlor, and co-trustee of the Trust.

118.     Northern Trust owed fiduciary duties to Mrs. Madden and her Trust.

119.     At all relevant times hereto, Vice President Walters acted as a vice president and officer of Northern Trust. Vice President Walters's conduct therefore constitutes the conduct of Northern Trust itself.

120.     Based on the acts and conduct alleged above, Northern Trust possessed fiduciary duties that it breached, which proximately caused damages to Mrs. Madden, the Trust, and its beneficiaries.

121.     Northern Trust's misconduct amounts to gross negligence because it was so reckless that it constitutes a conscious disregard or indifference to the safety and rights of Mrs. Madden, which contributed to the loss, damages, and/or injury to Mrs. Madden.

122.     Northern Trust, through Vice President Walters, engaged in intentional misconduct because it had actual knowledge of the wrongfulness of its conduct and the high probability that injury or damage would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury and/or damage to Mrs. Madden, the Trust, and its beneficiaries.

123.     Northern Trust, through Vice President Walters, had a specific intent to harm Mrs. Madden and Northern Trust's conduct did in fact harm Mrs. Madden.

## COUNT 6

## VICARIOUS LIABILITY FOR BREACH OF FIDUCIARY DUTY

124.    Mrs. Madden incorporates Paragraphs 1 through 68 as though fully set forth herein.

125.    Mrs. Madden brings this claim in her capacity as beneficiary, grantor and/or settlor, and co-trustee of the Trust.

126.    Based on the acts and conduct alleged above in this Complaint, Vice President Walters possessed fiduciary duties that he breached, which proximately caused damages to Mrs. Madden, the Trust, and/or its beneficiaries.

127.    Based on the acts and conduct alleged above in this Complaint, Vice President Walters breached his fiduciary duties during the course and scope of his employment as an agent and/or employee of Northern Trust.

128.    Northern Trust is consequently vicariously liable for Vice President Walters's misconduct and resultant damages.

129.    At all relevant times hereto, Northern Trust put Vice President Walters in a position that enabled Vice President Walters, as an agent of Northern Trust, to exploit Mrs. Madden while apparently acting within his authority. Mrs. Madden was justified in relying on Walters's authority given the circumstances.

130.    The lengthy course of conduct supports the inference that Northern Trust knowingly condoned, ratified, or consented to such conduct.

131.    Northern Trust actively and knowingly participated in the theft of Mrs. Madden's Trust estate because Vice President Walters acted as a managing agent with substantial authority and discretion on behalf of Northern Trust.

132.    Northern Trust's misconduct amounts to gross negligence because it was so reckless that it constitutes a conscious disregard or indifference to the safety and rights of Mrs. Madden, which contributed to the loss, damages, and/or injury to Mrs. Madden.

133.    Vice President Walters engaged in intentional misconduct because he had

actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury and/or damage to Mrs. Madden, the Trust, and its beneficiaries.

134.   Vice President Walters had a specific intent to harm Mrs. Madden and Walters's conduct did in fact harm Mrs. Madden.

## COUNT 7

### NEGLIGENT SUPERVISION

135.   Mrs. Madden incorporates Paragraphs 1 through 68 as though fully set forth herein.

136.   Mrs. Madden brings this claim in her capacity as beneficiary, grantor and/or settlor, and co-trustee of the Trust.

137.   Northern Trust owed a duty to Mrs. Madden and her Trust.

138.   Negligent supervision occurs when during the course of employment, an employer becomes aware, or should have become aware, of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment.

139.   At all material times hereto, Vice President Walters was employed as an agent, employee, and vice president of Northern Trust.

140.   Despite Vice President Walters's unfitness, of which Northern Trust knew or should have known, Northern Trust unreasonably failed to investigate and/or take corrective action.

141.   Northern Trust owed a duty that it breached, proximately causing damages to Mrs. Madden, the Trust, and its beneficiaries. These damages were a foreseeable result of Vice President Walters's unfitness as an employee.

142.    Northern Trust's misconduct amounts to gross negligence because it was so reckless that it constitutes a conscious disregard or indifference to safety and rights of Mrs. Madden, which contributed to the loss, damages, and/or injury to Mrs. Madden.

**COUNT 8**

**NEGLIGENCE**

143.    Mrs. Madden incorporates Paragraphs 1 through 68 as though fully set forth herein.

144.    Mrs. Madden brings this claim in her capacity as beneficiary, grantor and/or settlor, and co-trustee of the Trust.

145.    Northern Trust owed a duty to Mrs. Madden and her Trust.

146.    Based on the acts and conduct alleged above, Northern Trust possessed a duty that it breached which proximately caused damages to Mrs. Madden, the Trust, and/or its beneficiaries.

147.    Northern Trust's misconduct amounts to gross negligence because it was so reckless that it constitutes a conscious disregard or indifference to safety and rights of Mrs. Madden, which contributed to the loss, damages, and/or injury to Mrs. Madden.

**COUNT 9**

**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**
**(18 U.S.C. § 1030)**

148.    Mrs. Madden incorporates Paragraphs 1 through 68 as though fully set forth herein.

149.    Mrs. Madden brings this claim in her capacity as beneficiary, grantor, settlor, and co-trustee of the Trust.

150.    The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, provides a civil cause of action under § 1030(g) for any person who suffers damage or loss due to a

violation of the Act, including intentional access to a protected computer without authorization or exceeding authorized access to obtain information or cause damage.

151.    Northern Trust used computer systems to carry out the purpose of performing fiduciary duties, which included initiating authorized disbursements from Mrs. Madden's Trust, such as payments for her grandchildren's education expenses, as explicitly directed by Mrs. Madden and in strict accordance with the Trust agreements.

152.    The permission to use these computer systems to authorize disbursements from Mrs. Madden's Trust was limited to executing transactions explicitly approved by Mrs. Madden, and any actions beyond these limits constituted exceeding authorized access, as defined under 18 U.S.C. § 1030(e)(6).

153.    Northern Trust, acting through Vice President Walters, intentionally caused its computer systems to be used to access and transfer money out of accounts in a manner that exceeded the access Mrs. Madden approved of.

154.    This included allowing Vice President Walters to execute unauthorized transactions, diverting Trust assets to fund personal ventures such as failed gyms, satisfy personal credit card debts, and support his lifestyle..

155.    These actions were outside the scope of Mrs. Madden's limited grant of authority to use the protected computer systems to make specific disbursements, such as for educational expenses.

156.    Northern Trust's failure to implement adequate safeguards, monitoring systems, or internal controls to restrict  Vice President Walters's access to the limited authority granted by Mrs. Madden or to detect his unauthorized transactions enabled these violations of 18 U.S.C. § 1030(a)(4) with intent to defraud Mrs. Madden and the Trust.

157.   Northern Trust's actions, through Vice President Walters, caused damage and loss to Mrs. Madden and the Trust, including but not limited to the misappropriation of millions of dollars, lost investment opportunities, and financial harm to the Trust's beneficiaries.

158.   Northern Trust engaged in intentional misconduct because it had actual or constructive knowledge, through its failure to supervise Vice President Walters, of the wrongfulness of his conduct, knowing his access was limited to specific authorized disbursements, and the high probability that injury or damage would result from exceeding that authority.

159.   Despite this knowledge, Northern Trust allowed Vice President Walters to pursue that course of conduct, resulting in injury and damage to Mrs. Madden, the Trust, and its beneficiaries.

160.   Northern Trust knowingly condoned, ratified, or consented to Vice President Walters's misconduct by failing to detect or address his unauthorized access over a period of more than a decade and by continuing to collect fees from the Trust.

161.   As a direct and proximate result of Northern Trust's violations of the Computer Fraud and Abuse Act, Mrs. Madden and the Trust suffered damages, including but not limited to the loss of millions of dollars in Trust assets, lost investment opportunities, and other financial harm, in an amount to be determined at trial.

162.   Mrs. Madden has satisfied all conditions precedent before filing this claim.

163.   Pursuant to 18 U.S.C. § 1030(g), Mrs. Madden is entitled to compensatory damages and other equitable relief for Northern Trust's violations of the Computer Fraud and Abuse Act.

## Count 10

### VICARIOUS LIABILITY FOR VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT

**(18 U.S.C. § 1030)**

164. Mrs. Madden incorporates Paragraphs 1 through 68 and 148 through 162 as though fully set forth herein

165. Mrs. Madden brings this claim in her capacity as beneficiary, grantor, settlor, and co-trustee of the Trust.

166. As alleged in Paragraphs 148 through 162, Vice President Walters violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by intentionally accessing Northern Trust's protected computer systems in a manner that exceeded his limited authorized access, with the intent to defraud Mrs. Madden and the Trust, causing significant damage and loss.

167. Vice President Walters committed these violations during the course and scope of his employment as an agent and/or employee of Northern Trust. Northern Trust is consequently vicariously liable for Vice President Walters's misconduct and the resultant damages under the Computer Fraud and Abuse Act.

168. Northern Trust placed Vice President Walters in a position that enabled him to access its protected computer systems with limited authority to make specific disbursements, such as for Mrs. Madden's grandchildren's education expenses, while acting within the apparent scope of his authority as vice president and senior fiduciary relationship advisor. Mrs. Madden was justified in relying on Vice President Walters's authority, given his role as vice president of Northern Trust.

169. Upon information and belief, Northern Trust failed to implement adequate safeguards, monitoring systems, or internal controls to ensure Vice President Walters's access to its computer systems was restricted to his limited authority or to detect his unauthorized transactions, thereby enabling his violations of the Computer Fraud and Abuse Act.

170.     Northern Trust knowingly condoned, ratified, or consented to Vice President Walters's misconduct by failing to detect or address his unauthorized access over a period of more than a decade.

171.     Northern Trust actively and knowingly participated in the violations because Vice President Walters acted as a managing agent with substantial authority and discretion over the administration of Mrs. Madden's Trust.

172.     Northern Trust's failure to prevent Walters's unauthorized access to its computer systems, despite granting him limited authority, amounts to gross negligence, as it constitutes a conscious disregard or indifference to the safety and rights of Mrs. Madden, contributing to the losses and damages alleged herein.

173.     As a direct and proximate result of the violations of the Computer Fraud and Abuse Act, for which Northern Trust is vicariously liable, Mrs. Madden and the Trust suffered damages, including but not limited to the loss of millions of dollars in Trust assets, lost investment opportunities, and other financial harm, in an amount to be determined at trial.

174.     Mrs. Madden has satisfied all conditions precedent before filing this claim.

175.     Pursuant to 18 U.S.C. § 1030(g), Mrs. Madden is entitled to compensatory damages and other equitable relief for the violations of the Computer Fraud and Abuse Act.

### PRAYER FOR RELIEF

169.     Wherefore, Mrs. Madden respectfully requests judgment in her favor and entry of an order granting the following:

a.     An award of monetary damages which were caused by or otherwise resulted from Northern Trust's misconduct alleged herein.

b.     An award of punitive damages, as applicable.

c.     An award of Mrs. Madden's attorney's fees, costs, and expenses, as

provided for by applicable rules and statutes.

    d.  Pre-judgment and post-judgment interest.

    e.  Such further relief to which Mrs. Madden may be entitled and/or which the Court deems just and proper.

### JURY TRIAL DEMAND

  170.  Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a jury trial on all issues so triable.

Dated: January 28, 2026

        *s/ Lee Stapleton*
        Lee Stapleton (FBN 356778)
        Email:  lstapleton@carltonfields.com
        Aaron Weiss (FBN 48813)
        Email:  aweiss@carltonfields.com
        Carlton Fields, P.A.
        700 NW 1st Avenue, Suite 1200
        Miami, Florida 33136
        Telephone: 305-530-0050

        *Attorneys for Plaintiff Elizabeth Madden, individually and as co-trustee to the Elizabeth Ludwig Madden Revocable Trust*