**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:26-cv-20556-BECERRA/Torres**

ELIZABETH MADDEN,

     *Plaintiff*,

v.

THE NORTHERN TRUST COMPANY,

     *Defendant.*

                                     /

**PLAINTIFF ELIZABETH MADDEN'S RESPONSE**
**IN OPPOSITION TO DEFENDANT THE NORTHERN TRUST**
**COMPANY'S MOTION FOR PARTIAL DISMISSAL OF THE COMPLAINT**

Dated: March 6, 2026

/s/ *Lee Stapleton*

Lee Stapleton (FBN 356778)
Email: lstapleton@carltonfields.com
Aaron Weiss (FBN 48813)
Email: aweiss@carltonfields.com
Carlton Fields, P.A.
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Telephone: (305) 530-0050

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………1

LEGAL STANDARD……………………………………………………………………..2

ARGUMENT……………………………………………………………………………..2

    A.    **Mrs. Madden Plausibly Alleges Northern Trust Had Knowledge Of the Fraud and Intent to Facilitate the Fraud (Counts 1, 3, and 9)**……..… 2

        1.    The Intent and Knowledge of a Corporate Officer Is Generally Imputed to a Corporation When Pleading Intentional Torts…………………..2

        2.    The Adverse Interest Doctrine Does Not Bar Imputation………………..….5

        3.    The Sole Act Doctrine Forecloses The Adverse Interest Exception…….……..6

    B.    **Mrs. Madden's Fraud-Related Claims (Counts 3, 4, 9, and 10) Are Sufficiently Pled Under the Applicable Rules**……………………..……7

        1.    Rule 9(b) Does Not Govern The Vicarious Liability Counts…………..……..7

        2.    The Fraud-Related Claims Are Pled With Sufficient Particularity……..……..9

        3.    Northern Trust's Lawsuit Confirms It Has Notice of The Alleged Fraud……………………………………………11

    C.    **Mrs. Madden Plausibly Alleges Reliance (Counts 3, 4, 9, and 10)**……………12

    D.    **Mrs. Madden Plausibly Alleges Vicarious Liability (Counts 2, 4, 6, and 10)**……………………………………………12

        1.    Mrs. Madden Plausibly Alleges Apparent-Agency Liability…………………13

        2.    Mrs. Madden Plausibly Alleges Walters Acted Within The Scope Of His Employment……………………………………15

    E.    **Vicarious Liability Is Available Under The CFAA (Count 10)**……………………………………………18

    F.    **Mrs. Madden Plausibly Alleges Damage or Loss Under The CFAA (Counts 9 and 10)**…………………………..……19

CONCLUSION ………………………………………………………………………20

Plaintiff Elizabeth Madden responds in opposition to Defendant The Northern Trust Company's Motion for Partial Dismissal. [ECF No. 8].

### INTRODUCTION

Northern Trust is asking this Court to do something remarkable: dismiss claims that arise from the same fraudulent scheme that Northern Trust acknowledged occurred in its own lawsuit against its Vice President and Senior Fiduciary Relationship Advisor, Christopher Walters ("Walters"). *See The Northern Trust Company v. Christopher Walters*, S.D. Fla. Case No. 1:25-cv-23802-Altman (the "Walters Lawsuit") [Walters Lawsuit ECF Nos. 1 and 21].

In the Walters Lawsuit, Northern Trust detailed how Walters orchestrated a years-long scheme to misappropriate Mrs. Madden's funds using the authority and access his position at the bank provided. Yet here, when those same facts are described by Mrs. Madden—the actual victim of the scheme—Northern Trust claims the allegations are somehow insufficient.[1]

Specifically, Mrs. Madden's describes how Northern Trust appointed Walters as a Vice President and Senior Fiduciary Relationship Advisor, placed him in charge of administering her approximately $20 million Trust, and authorized him to execute trust agreements and administer trust transactions on Northern Trust's behalf. Armed with that authority, Walters used Northern Trust's own systems and disbursement procedures to siphon money from Mrs. Madden's Trust for years, which conduct Northern Trust has itself characterized as long-running fraud. *See* [Walters Lawsuit ECF No. 1 at 1] (stating that "[f]or years, [Walters] engaged in an elaborate scheme to … effectuate unauthorized transactions").

---

[1] Courts may take judicial notice of filings in other cases at the motion-to-dismiss stage because they are matters of public record whose existence is not subject to reasonable dispute. *See* Fed. R. Civ. P. 201(b); *Universal Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53-54 (11th Cir. 2006); *VIS Holdings Corp. v. Cooper*, 2007 WL 9702900, at *6 n.5 (S.D. Fla. Dec. 11, 2007) (Altonaga, J.).

1

Mrs. Madden's allegations describe a financial institution's Vice President abusing the authority and fiduciary power entrusted to him to defraud an elderly client over many years. At the pleading stage, that is more than enough. Northern Trust's focus on its own fiduciary officer as a rogue employee is not a basis for dismissal; it is a factual issue for the jury to decide.

## LEGAL STANDARD

To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the pleaded facts permit the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### A.  Mrs. Madden Plausibly Alleges Northern Trust Had Knowledge Of the Fraud and Intent to Facilitate the Fraud (Counts 1, 3, and 9)

Northern Trust argues that Mrs. Madden fails to plead the requisite knowledge and intent attributable to the corporation and therefore seeks dismissal of her claims for civil exploitation of a vulnerable adult (Count 1), fraud (Count 3), and violation of the Computer Fraud and Abuse Act (Count 9). [ECF No. 8] at 7-10. Northern Trust's argument rests on the flawed premise that knowledge and intent must be alleged separately at the corporate level independent of its officers.

### 1.  The Intent and Knowledge of a Corporate Officer Is Generally Imputed to a Corporation When Pleading Intentional Torts

Florida courts have "long held that a corporation can only act through its officers and agents," and when a corporate officer acts in that capacity, "the acts of [the officer] are indistinguishable from the acts of the corporation itself." *Kent Ins. Co. v. Schroeder*, 469 So. 2d 209, 210 (Fla. 5th DCA 1985) (*citing Browning v. State*, 133 So. 847, 848 (Fla. 1931)); *see also Schropp v. Crown Eurocars, Inc.*, 654 So. 2d 1158, 1161 (Fla. 1995) ("A corporation can act only through its agents."). Consequently, because "[c]orporations … have no state of mind of their

2

own" and can only act through their agents, "the scienter of their agents must be imputed to them." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir. 2008). Thus, as a general rule, "[a] corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge . . . even though the officer or agent does not in fact communicate the knowledge to the corporation." *Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1309 (S.D. Fla. 2000) (Gold, J.).

Mrs. Madden alleges that Northern Trust installed Walters as a Vice President and Senior Fiduciary Relationship Advisor, put him in charge of administering her Trust, and authorized him to execute trust agreements as co-trustee on Northern Trust's behalf. [ECF No. 1] at ¶¶ 6-8, 15, 33-41. She further alleges that Walters served as her primary fiduciary contact, controlled trust disbursements, and exercised day-to-day authority over her Trust from Northern Trust's Miami office. *Id.* at ¶¶ 16, 19-21, 33-41. These allegations plausibly place Walters in the category of a fiduciary managing the relationship for Northern Trust, and therefore support the imputation of knowledge and intent to the corporation at the pleading stage.

Northern Trust cannot avoid this conclusion by suggesting that Walters was not a "managing agent" whose conduct can expose Northern Trust to direct, intent-based liability. Walters' status as a managing agent *vel non*, is question of fact for the jury that should not be resolved on a motion to dismiss. *Horizon Leasing, A Div. of Horizon Fin., F.A. v. Leefmans*, 568 So. 2d 73, 75 (Fla. 4th DCA 1990) ("Where there exists any evidence from which a jury could conclude that the acts in question were committed by an agent within the scope of his employment, the questions of agency and scope are to be resolved by the jury."); *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 853-54 (Fla. 2003) (recognizing that these types of agency issues "are generally questions of fact for the jury").

Northern Trust cannot erase the agency relationship Mrs. Madden's alleges in her Complaint simply by denying it. Florida courts refuse to let a principal avoid liability simply by labeling a relationship as "independent" or "non-agent." *See, e.g., Font v. Stanley Steemer Int'l, Inc.*, 849 So. 2d 1214, 1216 (Fla. 5th DCA 2003) ("[T]he nature of the parties' relationship is not determined by the descriptive labels employed by the parties themselves."). The Restatement follows the same rule: "if the agreement results in the factual relation between [the parties] to which are attached the legal consequences of agency, an agency exists although the parties did not call it agency and did not intend the legal consequences of the relation to follow." Restatement (Second) of Agency § 1 cmt. b (1958).

Florida's punitive-damages framework, to the extent applicable, rests on the same premise and further illustrates why Northern Trust's "managing agent" argument is premature. The common law is well-settled that, in relevant part, a principal may be held directly liable for the intentional conduct of its agents or employees if "(a) the principal or a managerial agent authorized the doing and manner of the act, or (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment." *J.G. v. Carnival Corp.*, 2013 WL 795145, at *3 (S.D. Fla. Mar. 4, 2013) (Rosenbaum, J.) (quoting Restatement (Second) of Torts § 909 (1979)); *see also McArthur Dairy, Inc. v. Original Kielbs, Inc.*, 481 So. 2d 535, 540 (Fla. 3d DCA 1986) (favorably citing to Restatement (Second) of Torts § 909(c) (1979)). As Judge Rosenbaum noted in *J.G.*, "determining whether an employee is employed in a managerial capacity requires a 'fact intensive inquiry,'" focusing on the "type of authority that the employer has given to the employee" and "the amount of discretion that the employee has in what is done and how it is accomplished." *J.G.*, 2013 WL 795145, at *4.

4

Mrs. Madden's intentional tort claims do not rest on a bare allegation that "an employee did something bad while at work." They rest on detailed facts and Northern Trust's own concessions that a fiduciary officer used Northern Trust's authority and systems to perpetrate an intentional fraud on a trust client, and that Northern Trust responded as a culpable fiduciary actor— not as a bystander. At a minimum, those allegations and admissions preclude dismissal on the theory that Walters' intent cannot be attributed to Northern Trust at the pleading stage.

### 2.    The Adverse Interest Doctrine Does Not Bar Imputation

Northern Trust invokes the adverse interest doctrine to argue that Walters' knowledge and intent cannot be imputed because he acted secretly and for his own self-interest. [ECF No. 8] at 9-10. However, it is a narrow rule; "an agent's knowledge will be imputed to the principal unless the agent's interest is entirely adverse to the principal's interest, meaning the actions must neither be intended to benefit the corporation nor actually cause short-or long-term benefit to the corporation." *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1180 (11th Cir. 2025) (cleaned up).

The Eleventh Circuit's decision in *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087 (11th Cir. 2017) is instructive. There, a bank vice president allegedly used her position in connection with a fraudulent scheme, and the bank argued her knowledge could not be imputed because she acted for personal benefit. *Id.* at 1095-96. While Judge Moore granted the bank's motion to dismiss and motion for leave to amend, (*Chang v. JPMorgan Chase Bank, N.A.*, 2014 WL 7564668, at *8 (S.D. Fla. Dec. 8, 2014) (Moore, J.)), the Eleventh Circuit reversed and rejected the bank's argument, explaining that, even though the vice president was alleged to have acted in her own self-interest, the bank experienced short-term benefit from the vice president's fraudulent conduct in the form of wire and service fees. *Chang*, 845 F.3d at 1096 ("[A]t this time [the vice president] was working to further her own … interests. But we cannot say her interests were *entirely* adverse to the Bank's interests because her actions brought the Bank some short-term

benefit. … [the victim] alleged … that the Bank collected wire and service fees …. At least at the motion to dismiss stage, we may impute [the vice president's] knowledge to the Bank[.]").

Here, Mrs. Madden alleges that Northern Trust continued to collect substantial fiduciary and investment management fees during the period of exploitation. [ECF No. 1] at ¶¶ 48, 100(d), 160. She further alleges that Walters' subterfuge and concealment of his crimes allowed Northern Trust to maintain its marketed and trademark integrity, specifically that Northern Trust claims it "act[s] with the highest ethics, utmost honesty, and unfailing reliability." *Id.* at ¶¶ 11-12. These allegations plausibly show that Northern Trust derived at least short-term financial benefit from the continued administration while Walters exploited Mrs. Madden.

Under *Chang*, Mrs. Madden's allegations suffice at the motion to dismiss stage to defeat the adverse interest exception. And in light of a published Eleventh Circuit case that is undeniably on point, it is unfortunate that Northern Trust saw fit to burden the Court with this argument.

### 3.   The Sole Act Doctrine Forecloses The Adverse Interest Exception

Even if *Chang* did not foreclose the argument, dismissal would still not be warranted because the adverse interest exception is subject to the "sole actor doctrine." *Lemano Invs., LLC v. RGF Athena, LLC*, 390 So. 3d 154, 161 (Fla. 3d DCA 2024). The sole actor doctrine "may be invoked by an innocent third party against a corporation because in such circumstances it makes sense to impute the agent's knowledge, so that the corporation, rather than the third party, should suffer at the hands of the corporate agent." *Id.* (cleaned up).

Mrs. Madden alleges that Northern Trust wholly entrusted the administration of her Trust to Walters. [ECF No. 1] at ¶¶ 33, 35-37, 40-41, 45. She alleges that he was responsible for working with clients in connection with trust administration, that Northern Trust entrusted him with access to Trust funds and with authority to initiate and approve transactions affecting the Trust's account, and that he personally executed Madden's trust agreements on Northern Trust's behalf. *Id.* These

6

allegations plausibly show that Northern Trust made Walters the sole actor with respect to the day-to-day handling of Mrs. Madden's Trust, thereby triggering the sole actor doctrine and foreclosing application of the adverse interest exception at the pleading stage.

**B.      Mrs. Madden's Fraud-Related Claims (Counts 3, 4, 9, and 10)**
**Are Sufficiently Pled Under the Applicable Rules**

Northern Trust argues that the fraud-related claims (Counts 3, 4, 9, and 10) must be dismissed because they fail to satisfy Rule 9(b)'s heightened pleading standard. [ECF No. 8] at 11-13. That argument should be rejected for multiple independent reasons.

**1.      Rule 9(b) Does Not Govern The Vicarious Liability Counts**

To begin, two of the fraud-related counts are vicarious liability claims (Counts 4 and 10). Vicarious liability and agency allegations are governed by Rule 8(a)'s plausibility standard—not Rule 9(b)—and Mrs. Madden's allegations clear that bar. The distinction that Northern Trust misses is that for the vicarious liability claims, the fraud actor is Walters. As Mrs. Madden makes clear in her opposition, the fundamental problem with Northern Trust's motion is that it is questioning whether any fraud took place. This is shocking given that Northern Trust recently filed its action against Vice President Walters based on what Northern Trust described as his "blatant fraud and breach of fiduciary." [Walters Lawsuit ECF No. 1 at 1]. Or as the magistrate judge in this case observed in a similar situation, "what's good for the goose is good for the gander." *Stevens v. Penn Nat'l Gaming Inc.*, 2011 WL 13223586, at *5 (S.D. Fla. Oct. 17, 2011) (Torres, J.) (taking judicial notice of defendant's public filings before another tribunal that undermined defendant's position in the case being litigated in this District).

Courts in this District have explained that an agency relationship establishing vicarious liability for fraud "generally does not have to be pleaded with particularity." *CFTC v. Gibraltar Monetary Grp., Inc.*, 2004 WL 7334350, at *2 (S.D. Fla. July 22, 2004) (Dimitrouleas, J.). The

*Gibraltar* decision indicates that heightened particularity is required only where "the plaintiff relies upon the same circumstances to establish both the alleged fraud and the agency relationship." *Id*. In *Gibraltar*, the court recognized that Rule 9(b) required particularized fraud allegations; however, it treated agency allegations—such as those regarding broker agreement, referral obligations, shared documents, and fee flows—as being governed by Rule 8 and sufficient to withstand dismissal. *Id*. at *3.

Likewise, in *McFee v. Carnival Corp.*, 2020 WL 13389096 (S.D. Fla. Apr. 22, 2020) (Lenard, J.), the court rejected the argument that agency must be pleaded with Rule 9(b) particularity merely because it supported a fraud claim, reiterating that agency allegations are governed by Rule 8 unless the predicate facts for fraud and agency are identical. *Id.* at *7.

And most recently, Judge Damian's decision in *Taillard v. Mercedes Benz USA, LLC*, 805 F. Supp. 3d 1235 (S.D. Fla. 2025), also recognized that Rule 8 governs such theories at this stage. *Id*. at 1248 ("Thus, an agency relationship establishing vicarious liability for fraud generally does not have to be pleaded with particularity. … However, when the plaintiff relies upon the same circumstances to establish both the alleged fraud and the agency relationship … Rule 9(b) apply with equal force to the issue of agency and the underlying fraud claim.") (cleaned up).

By contrast, if a defendant misrepresented that he was authorized to act on behalf of a principal, and that same representation formed both the basis of the fraud claim and the asserted agency relationship, Rule 9(b) would apply to both parts of the claim, because the allegations establishing agency would be indistinguishable from those constituting the alleged fraud. *See, e.g., In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 291 (S.D.N.Y. 2005) (plaintiffs must allege agency with Rule 9(b) particularity only when "the false appearance of an agency relationship was part of the alleged fraud."). But that is not the case here.

8

Mrs. Madden's vicarious liability allegations fit comfortably within the pleading framework described in cases like *Gibraltar*, *McFee*, and *Taillard*. She alleges that Northern Trust appointed Walters as its Vice President and Senior Fiduciary Relationship Advisor; executed Mrs. Madden's trust agreements through Walters as co-trustee; gave him authority to initiate and approve trust transactions; and held him out as the fiduciary responsible for administering her Trust from its Miami office. [ECF No. 1] at ¶¶ 6-8, 33-41. She further alleges that Walters misappropriated trust funds "while operating in his capacity as an employee, vice president, and agent of Northern Trust," that his ability to steal "arose directly from Northern Trust's entrustment of fiduciary and trust administration functions to him," and that Mrs. Madden reasonably relied on Walters' apparent authority as Northern Trust's co-trustee when she allowed him to control her Trust. *Id.* at ¶¶ 16, 41-45, 64, 79-88, 103-12, 124-31.

### 2.     The Fraud-Related Claims Are Pled With Sufficient Particularity

Even putting the vicarious liability issue aside, Northern Trust's Rule 9(b) arguments still fail because Mrs. Madden pleads the fraudulent scheme with ample detail, particularly given the nature and duration of the alleged misconduct. Courts in this District recognize that where "alleged fraudulent conduct occurs over an extended period of time, and the acts are numerous, the specificity requirements of Rule 9(b) are applied less stringently to avoid 'substantial unfairness to private litigants who could not possible have detailed knowledge of all the circumstances surrounding the alleged fraud.'" *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1321 (S.D. Fla. 2017) (Moore, J.) (quoting *MeterLogic, Inc. v. Copier Sols., Inc.*, 126 F. Supp. 2d 1346, 1361 (S.D. Fla. 2000) (Gold, J.)).

That principle fits this case. Mrs. Madden alleges a scheme spanning "more than a decade," carried out through numerous transactions and thousands of communications while Walters administered the Trust under the Northern Trust fiduciary umbrella. [ECF No. 1] at ¶¶ 16, 19-20,

9

33 40-45, 51, 160, 170. In any event, Mrs. Madden's allegations satisfies Rule 9(b) by alleging facts as to the "who, what, when, where, and how" of Walters' fraudulent conduct. *Reach Air Med. Servs. LLC v. Kaiser Found. Health Plan Inc.*, 160 F.4th 1110, 1117 (11th Cir. 2025).

The *Who*: Mrs. Madden's allegations identify Walters as the individual who perpetuated the fraud and Northern Trust as the entity responsible for it since Walters acted in his corporate and fiduciary capacity. [ECF No. 1] at ¶¶ 2, 15, 33-34, 40-45.

The *What*: Amongst (many) other things, Mrs. Madden's allegations explain that Walters initiated unauthorized transfers and withdrawals from the Trust for his benefit, opened and paid personal credit card accounts with Trust funds, and that Northern Trust charged Mrs. Madden management fees during the years the fraud was being conducted. *Id.* at ¶¶ 16, 35, 42, 100(a)-(d), 109(a)-(d), 154. Mrs. Madden further alleges that during the same period, Walters and Northern Trust represented that Walters would act in Mrs. Madden's best financial interests, manage the Trust prudently, and act loyally and transparently. *Id.* at ¶¶ 96-98.

And to be pellucid: these are the same types of misconduct Northern Trust itself alleges in its own lawsuit against Walters. *See generally* [Walters Lawsuit ECF No. 1]. In other words, Northern Trust has already described the same fraud in detail in the Walters Lawsuit and successfully asked Judge Altman to enter judgment in its favor based on those allegations. [Walters Lawsuit ECF Nos. 21 and 23].  Northern Trust's theory is essentially inviting the Court to adopt the "Eleventh Floor Doctrine," which would mean that whatever else a litigant says on the Twelfth Floor of the Wilkie D. Ferguson Courthouse does not count against them on the Eleventh Floor. Northern Trust cannot plausibly maintain that allegations describing the same misconduct are somehow insufficiently particular when pled by the victim of that scheme.

The *When*: Mrs. Madden alleges that the fraud persisted "for more than a decade." [ECF No. 1] at ¶¶ 16, 160, 170. She alleges that Walters personally executed the Trust agreements

beginning in 2011 and engaged in this fraudulent conduct until he was released from Northern Trust in 2024. *Id.* at ¶¶ 33, 49.

The *Where*: Mrs. Madden alleges that the Trust was custodied and administered in Miami and that Walters misappropriated Trust assets while operating in his capacity as Vice President in Northern Trust's Miami office. *Id.* at ¶¶ 61-64, 67-68.

The *How*: Mrs. Madden alleges that Walters exploited Northern Trust's flawed disbursement approval system and that Northern Trust failed to implement adequate internal controls, segregation procedures, reconciliation safeguards, and supervision of fiduciary personnel. *Id.* at ¶¶ 42-44. She also alleges that Walters ingratiated himself to her through thousands of emails and communications to cultivate trust and induce reliance. *Id.* at ¶¶ 19-20.

Rule 9(b) does not require the Complaint to recite verbatim every single individual misrepresentation Walters made to Mrs. Madden throughout this decade-long fraudulent scheme. It would be impractical, if not impossible, to do so, considering that Walters sent "thousands of emails" and communications to Mrs. Madden during this time period. *Id.* at ¶ 19.

### 3.  Northern Trust's Lawsuit Confirms It Has Notice of The Alleged Fraud

The purpose of Rule 9(b) is notice: to alert defendants as to the precise misconduct charged and to protect them from vague or speculative accusations. *See Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) ("The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.").

Northern Trust cannot claim that it lacks notice here. In the Walters Lawsuit, Northern Trust alleged Walters repeatedly lied to Mrs. Madden, doctored emails and credit card statements, circumvented security safeguards, falsely reported verbal authorizations, and used Mrs. Madden's funds to pay his personal credit card bills and fund a business venture. *See* [Walters Lawsuit ECF

11

No. 1 at ¶¶ 10-12, 23-25]. Northern Trust's own pleading confirms that it understands the nature of the fraud at issue; thus, it defies common sense to suggest that Mrs. Madden's allegations lack sufficient factual detail to put Northern Trust on notice.

### C. Mrs. Madden Plausibly Alleges Reliance (Counts 3, 4, 9, and 10)

Northern Trust also argues the fraud-based claims (Counts 3, 4, 9, and 10) should be dismissed because the Complaint fails to allege that Mrs. Madden took any action in reliance on any of the alleged fraudulent misrepresentations made by Walters. [ECF No. 8] at 12-13. This argument ignores the detailed factual allegations describing precisely how Mrs. Madden relied on Northern Trust and Walters, and how that reliance enabled the misconduct to continue for years.

Mrs. Madden's Complaint alleges that both Northern Trust and Walters represented that Walters would act in her best financial interests, protect Trust assets, exercise expertise in financial markets, and act with transparency, loyalty, and good faith. [ECF No. 1] at ¶¶ 11-14, 41, 97, 106. Those representations were assurances made in the context of an ongoing fiduciary relationship governing the administration of Mrs. Madden's Trust. Mrs. Madden further alleges that she reasonably and justifiably relied on those representations. *Id.* at ¶¶ 99, 108. These allegations demonstrate that Mrs. Madden believed Walters was acting as a legitimate fiduciary and as a vetted Vice President of Northern Trust, thus she permitted him to maintain control over Trust disbursements and continued to allow Northern Trust to act as co-trustee.

These allegations satisfy reliance because they identify the misrepresentations and describe the actions she took (and refrained from taking) as a result; namely, continuing to entrust Northern Trust and Walters with control over millions of dollars in Trust assets.

### D. Mrs. Madden Plausibly Alleges Vicarious Liability (Counts 2, 4, 6, and 10)

Northern Trust argues that the vicarious liability claims (Counts 2, 4, 6, and 10) should be dismissed because Mrs. Madden alleges that Walters is a "rogue employee" who committed his

criminal scheme "for his own personal benefit," thereby demonstrating that he acted outside the scope of his employment. [ECF No. 8] at 13-16. That framing misstates both the allegations and the law since Mrs. Madden has plausibly alleged vicarious liability under the theories of (1) apparent-agency; and (2) the scope-of-employment.

### 1. Mrs. Madden Plausibly Alleges Apparent-Agency Liability

Northern Trust's reliance on the "rouge employee" label does not defeat apparent-agency liability. Florida law provides that a principal is liable when its conduct causes a third party to reasonably believe an agent acts with the principal's authority and the third party relies on that appearance, even if the agent acts entirely for personal gain. *Borg–Warner Leasing v. Doyle Elec. Co., Inc.*, 733 F.2d 833, 836 (11th Cir. 1984) (citing *Fidelity & Cas. Co. v. D.N. Morrison Constr. Co.,* 156 So. 385, 387 (Fla. 1934)).

In *Moro–Romero v. Prudential–Bache Securities, Inc.*, 1991 WL 494175 (S.D. Fla. Aug. 26, 1991), Judge Davis evaluated a situation where Prudential employed a vice president and account executive in its Miami office, assigned him to manage the plaintiff's account, and empowered him to solicit clients, provide investment advice, and maintain customer accounts. *Id.* at *1. The vice president then induced the plaintiff to reinvest funds into what he described as a Prudential-sponsored product, used Prudential indicia and paperwork to create the illusion of legitimacy, and diverted the funds to accounts he controlled. *Id.* at *1, *4.

Prudential argued it could not be liable because it did not benefit from the vice president's fraud and the conduct fell outside the scope of his employment. *Id.* at *2. The court rejected that theory, drew a distinction between scope-of-employment and apparent-authority doctrines, and stated that "under Florida apparent authority doctrine … [the plaintiff] does not have to demonstrate that Prudential benefitted from [the vice president's] conduct" because liability arises

13

when the principal "permits or causes" third parties to believe the agent acts under its authorization, even when the agent acts entirely for personal purposes. *Id.* at \*2-3 and footnote 20 thereto (citing Restatement (Second) of Agency §§ 8, 261, 262). The court further emphasized that Prudential created this appearance of authority by employing the thief as a vice president, assigning him to the plaintiff's account, allowing him to meet the plaintiff in Prudential's offices, providing a Prudential toll-free number, and issuing business cards identifying him as a Prudential officer. *Id.* at \*3-4.

Judge Cooke favorably relied on *Moro–Romero* in another bank fraud case two decades later: *Scinica v. Bank of Am., N.A.* 2010 WL 1257704 (S.D. Fla. Mar. 29, 2010). The complaint in *Scinica* alleged that a Bank of America assistant branch manager handled all of the plaintiff's account issues, assured her that her money was sound and earning interest, and left the bank with no record of any certificates of deposits in her name. *Id.* at \*1. The court recognized that a principal is liable for an agent's torts when the agent acts within "his apparent authority," and as a result, the court denied the bank's motion to dismiss the plaintiff's intentional torts claim, finding that the allegations demonstrated that the bank held the assistant branch manager out as someone authorized to do business with customers and that the plaintiff relied on that authority. *Id.* at \*2 (citing *Life Ins. Co. of N. Am. v. Del Aguila*, 417 So. 2d 651, 652 (Fla. 1982)). Judge Cooke also noted that the assistant branch manager scheme had generated other lawsuits where both she and Judge King likewise denied motions dismiss because the plaintiffs had pled sufficient facts to support liability based on apparent authority. *Scinica*, 2010 WL 1257704, at \*2 n.2 (citing *Sadarangani v. Bank of Am., N.A.*, 2009 WL 2175631 (S.D. Fla. July 21, 2009) (King, J.), and *De Szterensus v. Bank of Am., N.A.*, 2010 WL 427509 (S.D. Fla. Sept. 29, 2009) (Cooke, J.)).

14

Mrs. Madden alleges that Northern Trust, as co-trustee and fiduciary of her Trust, made Walters a Vice President and Senior Fiduciary Relationship Advisor, assigned him to administer her Trust, had him execute her Trust agreements on Northern Trust's behalf, entrusted him with authority to initiate and approve Trust transactions, and induced her to rely on his advice as a vetted fiduciary officer. [ECF No. 1] at ¶¶ 7-8, 16, 19-22, 33-43, 64-67. Walters used that authority to divert Trust funds to fund his lifestyle. *Id.* at ¶¶ 16, 22, 35, 40-43, 64-67. Those allegations place this case within the apparent-agency framework that courts in this District found sufficient and therefore does not require any showing that Walters' theft benefitted Northern Trust.

### 2. Mrs. Madden Plausibly Alleges Walters Acted Within The Scope Of His Employment

Mrs. Madden also alleges facts sufficient for a jury to find that Walters' misconduct arose directly from the trust-administration functions Northern Trust gave him and thus supports vicarious liability under a scope-of-employment theory. Northern Trust asks the Court to rule, as a matter of law, that Walters acted outside the scope of his employment because Walters was a rogue employee and self-interested. The governing cases foreclose that result at the pleading stage.

"Under Florida law, an action falls within the scope of employment if the conduct: (1) is of the kind the employee was employed to perform; (2) occurred within the time and space limits of the employee's employment; and (3) was activated at least in part by a purpose to serve the employment." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009) (citing *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 357 (Fla. 3d DCA 2001)).

Illegal or self-serving acts are not *per se* outside the scope of employment. To the contrary, courts routinely treat such conduct as within the scope where the employee's duties and authority created the very conditions that enabled the misconduct, regardless of whether the employer directed or authorized it. *See, e.g.*, *Hennagan v. Dep't of Highway Safety & Motor Vehicles*, 467

15

So. 2d 748, 751 (Fla. 1st DCA 1985) (police officer's molestation of minor suspected of shoplifting was within scope of employment where the officer was still on duty during the illegal act); *McMillan v. Dep't of Corr.*, 2016 WL 4059230, at *3-4, 8-9 (N.D. Fla. July 8, 2016), *report and recommendation adopted*, 2016 WL 4059679 (N.D. Fla. July 27, 2016) (correctional officer's sexual assault of prisoner within the scope of employment where abuse occurred during correctional activities and abusive correctional culture created environment for illegal activity).

In *Sadarangani*, the plaintiffs sued Bank of America for intentional torts after an assistant branch manager stole funds from their bank accounts using his control over certificates of deposits and related instruments. 2009 WL 2175631, at *1-2. Judge King rejected the bank's argument that the assistant branch manager's theft fell outside the scope of employment because "he was not hired to steal," explaining  that the complaint did not need to allege the bank was "in the business" of stealing or trading in customer funds; it sufficed that the assistant branch manager's job required him to deal with customer accounts and the same types of transactions he later misused. *Id.* at *2-3. The court further emphasized that scope-of-employment disputes of this kind are typically for the jury—not the court on a motion to dismiss. *Id.* at *2.

In reaching that result, the court relied on *United Techs. Corp. v. Mazer*, 556 F.3d 1260 (11th Cir. 2009), which held that an employer could face vicarious liability where an employee with authority over proprietary information stole that information and further held that any dispute over scope of employment should be resolved by the jury on a fuller record, not by dismissing the complaint at the outset. *Id.* at 1272-73 (applying Florida law).

Northern Trust's own cases on the issue ([ECF No. 8] at 13-14) are distinguishable since they involved either an alternative dispositive issue (*e.g.*, statute of limitations), less specific pleading when compared to this case, pure personal curiosity unrelated to job duties, or violent

16

crimes that bore no relationship to the employee's assigned functions. *McConley v. Wells Fargo Bank, N.A.*, 2025 WL 3190880, at *8 (N.D. Fla. Oct. 15, 2025) (dismissing complaint with prejudice for mismanagement by bank employees where claims fell outside statute of limitations as a matter of law); *Duncan v. NCS Pearson, Inc.*, 2023 WL 8250639, at *3-5 (S.D. Fla. Oct. 10, 2023) (Cannon, J.) (dismissing complaint for repeated failures to include non-conclusory allegations); *Letourneau v. City of Pembroke Pines*, 2017 WL 9362841, at *3 (S.D. Fla. Apr. 4, 2017) (Bloom, J.) (dismissing with prejudice where plaintiffs repeatedly alleged that the use of police database was for "curiosity" not job duties or public interest); *Watson v. Kingdom of Saudia Arabia*, 159 F. 4th 1234, 1269-70 (11th Cir. 2025) (holding Saudi trainee's mass shooting fell outside scope of employment because it was unrelated to the trainee's assigned job duties).

Notably, the physical-impact tort cases Northern Trust cites are a poor analog for this financial -misconduct context. Even viewed through that lens, Walters is better understood as akin to a boxing instructor alleged to have intentionally punched a student during a sparring session, and where the key dispute would be whether the conduct fell within the scope of the assigned activity, a question typically reserved for the factfinder.

Mrs. Madden alleges that Walters' responsibilities "included working with clients of Northern Trust's trust department in connection with the administration of trusts, such as the Trust, and he was thereby involved in the exercise of Northern Trust's fiduciary functions as trustee." [ECF No. 1] at ¶ 40. She further alleges that Northern Trust "entrusted Walters with access to Trust funds and with authority to initiate and approve transactions affecting the Trust's accounts," held him out as the officer responsible for Trust administration, and that, while acting in that role, Walters "intentionally stole and misappropriated substantial Trust funds by initiating unauthorized transfers and withdrawals from the Trust's accounts for his own personal benefit and for purposes

17

unrelated to the Trust," with Northern Trust's deficient internal controls allowing the embezzlement to continue undetected. *Id.* at ¶¶ 41-42.

Those allegations depict Walters doing the same kinds of work he was hired to do—administering the Trust, initiating and approving disbursements, and managing trust-department client relationships—during his tenure as a Vice President and Senior Fiduciary Relationship Advisor in Northern Trust's Miami office, using Northern Trust's trust-administration and disbursement systems. *Id.* at ¶¶ 16, 33-43, 64. Mrs. Madden also alleges that Northern Trust collected more than $1 million in fees for administering the Trust during the years Walters was stealing from it, which shows that his ongoing work on the Trust advanced Northern Trust's business even as he abused his position. *Id.* at ¶ 48. Consistent with *Sadarangani*, *Mazer*, and Florida decisions reserving agency and scope-of-employment disputes for the jury when reasonable inferences diverge, these allegations comfortably support a scope-of-employment vicarious-liability theory at the motion-to-dismiss stage.

### E.      Vicarious Liability Is Available Under The CFAA (Count 10)

Northern Trust also argues that Count 10 should be dismissed because the Consumer Fraud and Abuse Act (CFAA) purportedly does not permit vicarious liability absent allegations that the employer directed or encouraged the misconduct. Northern Trust employs unusual phrasing here and says that "courts have held that vicarious liability is simply not cognizable under the CFAA." [ECF No. 8] at 16.

Mrs. Madden submits that a better description of where the law stands on this issue, that accounts for persuasive authority,[2] would be as follows "while some courts have found that

---

[2] *Boneta v. Am. Med. Sys., Inc.*, 2021 WL 2037797, at *4 n. 4 (S.D. Fla. May 21, 2021) (Ruiz, J.) (discussing the "propriety of disclosing non-binding decisions that are on point") (cleaned up) (citing Peter D. Webster, *Ethics and Professionalism on Appeal*, 85 Fla. Bar J. 16, 18 (2011)).

vicariously liability is not cognizable under the CFAA, both the only decision from this District (*Arko Plumbing Corp. v. Rudd*, 2013 WL 12120521 (S.D. Fla. Nov. 21, 2013) (Ungaro, J.) and the only Circuit Court level decision (*Abu v. Dickson*, 107 F.4th 508 (6th Cir. 2024) to have addressed the issue, support the proposition that there can be a vicarious liability claim from violations of the CFAA in the same manner that a typical tort claim in analyzed.[3]

### F.      Mrs. Madden Plausibly Alleges Damage or Loss Under The CFAA (Counts 9 and 10)

Northern Trust contends that the CFAA claims fail because Mrs. Madden does not allege "damage or loss" within the meaning of the statute. [ECF No. 8] at 17-19. The CFAA provides a civil remedy to "[a]ny person who suffers damage or loss by reason of a violation of this section." 18 U.S.C. § 1030(g). The statute broadly defines "loss" to include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the system … as well as any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11); *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017) (holding that not all "loss[es]" need to be causally connected to the interruption or exceeded access, as long as the damages involved responding to a CFAA violation); *Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279, 1295 (S.D. Fla. 2020) (Altman, J.).

Here, Mrs. Madden plausibly alleges that Walters exploited Northern Trust's internal computer-based systems governing trust administration and disbursement approvals to initiate

---

[3] While the Eleventh Circuit has not addressed the vicarious liability question with respect to the CFAA it has favorably relied on the same analysis that the Sixth Circuit used in *Abu* when evaluating vicarious liability claims under other federal statutes. *See, e.g.*, *Doe v. Drummond Co., Inc.*, 782 F.3d 576, 607 (11th Cir. 2015) ("Where Congress ... has not expressed a contrary intent, the Court has drawn the inference that it intended ordinary rules to apply.") (citing *Meyer v. Holley*, 537 U.S. 280, 287 (2003)).

unauthorized transfers and withdrawals from the Trust's accounts over many years, resulting in a "loss" to Mrs. Madden well exceeding the $5,000 statutory minimum.

These allegations describe a scheme that depended on manipulating Northern Trust's electronic trust-management and transaction systems to effectuate unauthorized transactions. As alleged, Walters repeatedly accessed those systems to execute fraudulent disbursements, thereby disrupting the proper functioning of the Trust's account administration and depriving Mrs. Madden of the use and control of her assets for years. [ECF No. 1] at ¶¶ 151-55. The resulting losses were misappropriated funds and the lost investment opportunities that would have accrued had those funds remained in the Trust, all of which are consequential damages flowing from the interruption of the Trust's financial services and administration. *Id.* at ¶¶ 161, 173.

Mrs. Madden's losses are causally connected with Walters' CFAA violations. *Id.* At the pleading stage, these allegations are sufficient to satisfy the CFAA's requirement pleading "damage or loss." *See Hall v. Sargeant*, 2020 WL 1536435, at *31 (S.D. Fla. Mar. 30, 2020) (Altman, J.) (identifying "two ways for a CFAA plaintiff to show 'loss': (1) lost revenues and costs as a result of interruption of services, and (2) costs incurred in responding to a CFAA violation") (citation omitted)).[4]

### CONCLUSION

For the reasons set forth herein, Northern Trust's Motion for Partial Dismissal should be denied.

---

[4] Mrs. Madden's counsel warrants that Mrs. Madden has incurred substantial costs (well in excess of $5,000) in investigating Walters' scheme and having a forensic review of the Trust's accounts conducted. To the extent deemed necessary, Mrs. Madden can, by interlineation or otherwise, add a few words to Counts 9 and 10 to supplement the claim. Or, alternatively this information can be covered by an interrogatory.

Dated: March 6, 2026

/s/ *Lee Stapleton*
Lee Stapleton (FBN 356778)
Email: lstapleton@carltonfields.com
Aaron Weiss (FBN 48813)
Email: aweiss@carltonfields.com
Carlton Fields, P.A.
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Telephone: (305) 530-0050

*Attorneys for Plaintif*

21