**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 1:26-cv-20556-BECERRA/Torres**

ELIZABETH MADDEN,

      Plaintiff,

v.

THE NORTHERN TRUST COMPANY,

      Defendant.

_____/

*** *Expedited Relief Request* ***

*Plaintiff requests a ruling by Monday, July 27, 2026.*

**PLAINTIFF ELIZABETH MADDEN'S**
**EXPEDITED MOTION FOR DISCOVERY SANCTIONS**

Lee Stapleton (FBN 356778)
Email: lstapleton@carltonfields.com
Aaron Weiss (FBN 48813)
Email: aweiss@carltonfields.com
Amy Furness (FBN 34355)
Carlton Fields, P.A.
Email: afurness@carltonfields.com
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Telephone: 305-530-0050

*Attorneys for Plaintiff Elizabeth Madden*

Plaintiff Elizabeth Madden moves pursuant to Fed. R. Civ. P. 30(d)(2), 37(a)(5)(A), 37(b)(2)(C), and 37(c), for entry of an order imposing sanctions against Defendant Northern Trust and its counsel based on their repeated obstruction of discovery. Among other issues, they failed to comply with the Court's directives concerning the court-ordered Rule 30(b)(6) deposition about Northern Trust's data retention policies and practices and then produced an unprepared Rule 30(b)(6) designee. They also withheld relevant documents until after the depositions at which those documents were needed and after expert reports were served.

For the reasons detailed in this motion, the Court should impose monetary sanctions against Northern Trust and its counsel. But such relief will not be sufficient. Northern Trust should not benefit from its dilatory tactics and Mrs. Madden—an elderly widow fighting a bank that has a *trillion* dollars of assets—should not have to occur additional expense. Northern Trust should not be entitled to rely on the late produced documents.

### GROUNDS FOR EXPEDITED RELIEF

Mrs. Madden seeks important guidance as to how the remaining weeks of fact and expert discovery will proceed. As of today, there are less than three weeks remaining of fact discovery and dispositive and expert-related motions are due on August 17, 2026. Accordingly, and consistent with S.D. Fla. 7.1(d)(2), expedited relief is necessary.

As detailed herein, Northern Trust produced important documents that Mrs. Madden requested on the day discovery opened only after the relevant fact witnesses had been deposed and expert reports had been exchanged. Unless the permissible use of those materials is resolved before the dispositive motion deadline, Northern Trust may attempt to rely on them at summary judgment or use the materials to supplement, explain, or rehabilitate testimony that Mrs. Madden was required to obtain without them.

1

## INTRODUCTION

Mrs. Madden was first victimized when Northern Trust's own Vice President and Senior Fiduciary Relationship Advisor, Christopher Walters ("Vice President Walters"), stole millions of dollars from her trust over more than a decade while Northern Trust collected fees, supervised him, and failed to detect what he was doing. Northern Trust is victimizing her again now, by turning discovery into a strategy of delay, ambush, and attrition designed to ensure that critical evidence arrives only after Mrs. Madden has lost the opportunity to use it.

For decades, Northern Trust collected fees to serve as co-trustee of her Trust while one of its own Vice Presidents stole millions of dollars from it. Mrs. Madden came to this Court seeking accountability for that betrayal. Northern Trust has responded by making a mockery of the discovery process, treating Mrs. Madden's right to obtain evidence as optional, and forcing her counsel to prepare for and conduct depositions without documents Northern Trust possessed and should have produced months earlier.

Discovery depends on the parties' ability to trust that their opponents are following the rules and timely producing responsive materials. Northern Trust's conduct undermines that basic premise.

Northern Trust invoked unspecified "data retention limitations" to explain why records documenting the fraud supposedly no longer existed, then refused to produce the policies underlying those limitations as irrelevant "discovery about discovery." Court intervention was required merely to permit Mrs. Madden to test those representations via a 30(b)(6) deposition. Northern Trust then withheld its own records retention schedule until the night before the court-ordered deposition, in a format that could not be accessed in time for meaningful review, and presented a designee prepared on only three of eleven topics noticed.

2

And that was not an isolated incident. On the day of the court-ordered deposition (and after four other Northern Trust witnesses had already been deposed) Northern Trust produced hundreds of pages of fiduciary policies, employee handbooks, fraud detection procedures, and other records that Mrs. Madden had requested since the inception of discovery and that bore directly on testimony those witnesses had already given.

The timing is especially pernicious because this case is proceeding on an expedited schedule. As Mrs. Madden explained when she sought an expedited schedule and trial date, this is "a case about time," ECF No. 4, and about the very real risk that justice will arrive too late because Mrs. Madden's age and declining health create a genuine risk that she may be unable to participate in trial or obtain relief during her lifetime.

Northern Trust's "run out the clock" tactics have forced Mrs. Madden into an impossible choice: abandon meaningful examination of Northern Trust's witnesses or incur significant expense and face diverting the limited time remaining to repeating depositions that should have been conducted in a fulsome manner in the first instance. This is not fair.

That prejudice cannot be measured solely in attorneys' fees and costs. Mrs. Madden seeks tens of millions of dollars in damages. If the only consequence is a modest award of discovery expenses, Northern Trust will have successfully manipulated the expedited court procedure through its delay while only paying a small fraction of the amount at stake. Reopening fact witness depositions is not a sufficient remedy as it would reward Northern Trust's delay by giving it a second opportunity to prepare witnesses using materials it withheld during their original examinations. Whether by design or reckless indifference, Northern Trust's conduct threatens to consume the one resource this Court sought to protect and Mrs. Madden cannot recover: time.

Northern Trust should not be permitted to rely on the belatedly produced materials, or use them to contradict, supplement, or rehabilitate the testimony its witnesses gave without them. Such

3

a sanction would eliminate the unfair advantage caused by Northern Trust's delay and restore Mrs. Madden's ability to develop and present her case. Mrs. Madden therefore seeks not only the fees and costs caused by Northern Trust's obstruction, but also relief that eliminates the unfair evidentiary advantages Northern Trust has obtained and preserves the expedited trial schedule.

## FACTUAL BACKGROUND

### a. Northern Trust Failed to Detect More Than a Decade of Fraud

This case arises from an extraordinary and undisputed betrayal. Vice President Walters stole millions of dollars from Mrs. Madden. Northern Trust employed Vice President Walters, supervised him, promoted him, entrusted him with access to Mrs. Madden's assets, and collected fees for serving as co-trustee. Yet Northern Trust never detected the theft.

In January 2025, Mrs. Madden decided to move her Trust to a different institution. During the routine onboarding that followed, an employee of that new institution discovered what Northern Trust had failed to detect for years: unauthorized transfers, check disbursements, and account movements orchestrated by Vice President Walters.

The records most important to determining the complete scope of Vice President Walters' fraud, including wire transfer records, check images, and account statements, are precisely the records Northern Trust now claims it cannot produce because of its data retention practices.

### b. Northern Trust Invoked "Data Retention Limitations" But Refused to Produce the Policies Underlying Them

Even before this lawsuit was filed, Northern Trust repeatedly represented to Mrs. Madden and her counsel that records documenting Vice President Walters's transactions were unavailable because of "data retention limitations." *See, e.g.*, **Exhibit A**, May 16, 2025 Pre-Suit Letter; **Exhibit B**, May 30, 2025 Pre-Suit Letter; **Exhibit C**, June 13, 2025 Pre-Suit Letter.

4

On March 7, 2026, the day discovery opened, Mrs. Madden served requests directed at the very policies Northern Trust had repeatedly invoked. Request for Production No. 64 sought "[a]ll documents reflecting Northern Trust's data-retention policies and other data-retention limitations." Request for Production No. 80 sought "[a]ll documents evidencing data retention policies and limitations." **Exhibit D**, Northern Trust's Amended Responses to First RFP, Nos. 64, 80. Northern Trust objected to both requests as follows: "Defendant objects to this Request as irrelevant in that it seeks discovery about discovery. Based on the foregoing objection, Defendant does not agree to search for and produce documents in response to this Request." *Id.*

Northern Trust continued to assert the same limitation in formal discovery, objecting to numerous requests on the ground that it possessed documents only for "the 10-year period prior to discovery of the unauthorized transactions given Northern Trust's data limitations." **Exhibit D**, Northern Trust's Amended Responses to First RFP, Nos. 36, 43, 47-49, 51-52, 65-66, 68, 70, 72, 74-75, 77; **Exhibit E**, Northern Trust's Responses to Second RFP, Nos. 1, 9, 12.

### c. The Court Ordered Northern Trust to Produce a Knowledgeable Corporate Representative on Records Issues But Northern Trust Unilaterally Limited this Court-Ordered Deposition

Following Mrs. Madden's conferral efforts, the parties appeared before Judge Torres at a hearing on June 4, 2026. **Exhibit F**, Discovery Conferral Letter; **Exhibit G**, June 4, 2026 Hearing Transcript ("Hr'g Tr."). While Northern Trust claims that the relevant records no longer existed, Judge Torres noted that organizations do not always follow their stated retention policies, explaining that "just because you have a retention policy that would suggest that documents prior to 2015 would have been destroyed doesn't actually mean that they were destroyed." *Id.* at 18. The Court further made clear that Mrs. Madden's counsel "is entitled to depose the bank or the person with the most knowledge of the search, period." *Id.* at 22.

Judge Torres thus ordered Northern Trust to produce a Rule 30(b)(6)/records-custodian witness for deposition. The Court explained that the deposition was "targeted to this question as to what documentation the defendant produced and didn't produce and why it didn't produce it and whether a search was conducted of the documents that she claims is missing." *Id.* at 21. The Court required the deponent to have "personal knowledge of the search," to be able to "vouch for it on behalf of Northern Trust," and to be adequately educated by Northern Trust. *Id.* at 23-24.

Following Judge Torres' order, Mrs. Madden noticed Northern Trust's Rule 30(b)(6) deposition on eleven topics tailored to the Court's directive. **Exhibit H**, Notice of Rule 30(b)(6) Deposition, Schedule A.

Northern Trust claimed that the topics "far exceed[ed] the scope" of the deposition ordered by Judge Torres and announced that its witness would testify only on subjects Northern Trust considered consistent with the order. **Exhibit I**, July 10, 2026 Objection Letter. However, Northern Trust did not seek a protective order limiting the deposition.

> **d.** **Northern Trust Produced its Data Retention Schedule the Night Before The Deposition—128 Days After They Were Requested and 98 Days After Northern Trust Stated it Objected to Producing Such Items**

At 6:42 p.m. on July 13, 2026, the night before the deposition, Northern Trust produced documents described as its "global records retention schedule." **Exhibit J**, July 13, 2026 Production Letter. These were the same categories of documents Mrs. Madden had requested in RFP Nos. 64 and 80 more than four months earlier on the day discovery opened. Northern Trust offered no explanation for withholding them until the evening before the deposition.

The documents were transmitted in Relativity load-file format, and as a result, were not accessible to Mrs. Madden's counsel until the morning of July 14, 2026. Mrs. Madden's counsel therefore had no meaningful opportunity to review the retention materials before the deposition began.

### e. Northern Trust Produces a Witness Prepared on Only Three of Eleven Topics

At the July 14, 2026 deposition, Northern Trust's designee, Thomas Kelleher,[1] testified that he was prepared to address only Topics 2, 3, and 4, which concerned the date limitations previously identified for wire transfers, account statements, and check images. **Exhibit K**, 30(b)(6) Dep. Tr. at 41-47. Mr. Kelleher admitted that he was not prepared to testify about the remaining eight topics, including the searches performed for Mrs. Madden's records, litigation holds, post-discovery destruction, or the persons responsible for implementing the applicable policies. *Id.*

Mr. Kelleher also admitted that he did not consult anyone from Northern Trust's data-governance team, despite acknowledging that the data-governance team is responsible for implementing and overseeing Northern Trust's records retention schedule. *Id.* at 10. He further explained that he only reviewed that schedule for this case on July 13, 2026, the day before his deposition, and he did not bring it with him to the deposition. *Id.* at 49-50, 53-54. Consequently, when asked about Northern Trust's retention practices, Mr. Kelleher, now appearing as the 30(b)(6) designee, still was unable to answer the questions and kept directing Mrs. Madden's counsel to the global records retention schedule produced the prior evening. *Id.* at 34-35, 52-54. Mrs. Madden's counsel did not realize until during the deposition the evasive answers referred to a document produced. Therefore, she needed to take a one-hour break in the deposition to review the records retention schedule.

### f. Northern Trust Purported to Withdraw Its Objections Only After Mrs. Madden Incurred Significant Expense

During the Rule 30(b)(6) deposition, Northern Trust's counsel characterized the eve-of-deposition production as "very much in the spirit" of "us withdrawing an objection" to producing

---

[1] Mr. Kelleher was deposed in his individual capacity three weeks earlier wherein he repeatedly stated that he lacked knowledge concerning Northern Trust's data retention policies and practices. **Exhibit M**, Kelleher Dep. Tr. at 93-94, 97, 105.

the retention policy records. *Id.* at 39-40. But Northern Trust did not formally withdraw its responses to RFP Nos. 64 and 80, explain why the objections had been maintained, acknowledge the expense caused to Mrs. Madden, or propose any remediation. By then, Mrs. Madden had already incurred the expense associated with this discovery dispute, such as the June 4, 2026 hearing, and preparation of a deposition at which Northern Trust's witness was unprepared on most of the noticed topics.

g. **Northern Trust Produced Additional Documents After the Relevant Witnesses Were Deposed and Expert Reports Were Exchanged**

The global records retention schedule was not the only evidence Northern Trust withheld until it could no longer be used effectively. On July 14, 2026, Northern Trust produced 1,691 pages of documents. Those documents also included records Mrs. Madden sought since the inception of discovery. That production arrived with several critical deadlines fast approaching: rebuttal expert disclosures were due July 28, 2026; mediation was set for August 6, 2026; discovery closed August 10, 2026; and dispositive and expert-related motions were due August 17, 2026. They included Northern Trust's fiduciary policies and employee handbooks spanning 2011 through 2024; standards of conduct, its elder abuse and exploitation reporting reference guide; and its wealth management code of ethics; all of which were responsive to various requests in Mrs. Madden's First RFP, served on March 5, 2026. *See* **Exhibit D**, Northern Trust's Amended Responses to First RFP, Nos. 10-11, 28-31, 41-42, 48, 65, 78, 82, 86-88. [2]

Northern Trust objected to searching for or producing those materials in April and June. Yet when Northern Trust finally chose to produce them in July, they were readily available. These

---

[2] Attached as **Exhibit P** is a chart identifying certain requests from Mrs. Madden's First RFP to which the July 14 production is responsive and to which Northern Trust's expert has relied upon in their report. That chart is not exhaustive as Mrs. Madden's counsel continues to review the July 14 production against the requests in her First RFP, and therefore Mrs. Madden expressly reserves the right to identify additional responsive requests as her review continues.

were not obscure records buried in an inaccessible archive. They were standard enterprise policies, employee handbooks, and fiduciary governance materials maintained by a sophisticated financial institution that serves as trustee for its clients. The timing of their production supports the inference that Northern Trust did not merely overlook the records. It withheld them until Mrs. Madden's most effective opportunity to use them had passed and her experts had formed their opinions without the benefit of these records. By the time Northern Trust produced those documents, four Northern Trust witnesses had already been deposed on the subjects the documents addressed.

For example, Northern Trust employee Leslie Garcia, who was member of the wealth management team that directly served Mrs. Madden's account, was deposed on June 22, 2026. **Exhibit L**, Garcia Dep. Tr. at 9. While Ms. Garcia testified that she receives mandatory annual fraud prevention training, when asked to describe any indicators of internal employee theft, she responded, "How would I know that?" and stated, "I don't know how to answer that." *Id.* at 53-54. She further confirmed that elder abuse training is mandatory, but described its content only in terms of third parties calling on behalf of elderly clients. *Id.* at 54-55. When asked to define fiduciary duty, Ms. Garcia stated she could not recall it and when asked to describe Northern Trust's fiduciary duty to a co-trustee specifically, she responded: "I can't answer that right now." *Id.* at 56-57.

Likewise, Thomas Kelleher, Northern Trust's Global Head of Fraud Risk Management, was deposed in his individual capacity on June 24, 2026. **Exhibit M**, Kelleher Dep. Tr. at 25-26. He testified that Northern Trust maintained a mandatory consecutive-leave requirement designed in part to surface ongoing employee misconduct, but stated he did not have records showing whether Vice President Walters had ever complied because that policy is administered by Human Resources and neither he nor his team had access to those records. *Id.* at 143-46. When asked

9

whether Northern Trust runs credit checks on employees after hiring or monitors whether employees are experiencing financial difficulties, he testified he did not know. *Id.* at 33-36.

Similarly, Alexander Adams, Northern Trust's Regional President for South Florida and the Mid-Atlantic Region, was deposed on June 25, 2026. **Exhibit N**, Adams Dep. Tr. at 6. When asked whether the fiduciary duty owed to a trust client differs from that owed to an ordinary banking or broker-dealer client, Mr. Adams stated, "I don't believe so." *Id.* at 5. And, when pressed further, whether Northern Trust, as corporate co-trustee, owed Mrs. Madden any heightened fiduciary duty toward her specifically, he answered, "I don't know the answer to that." *Id.* at 8. When asked whether Northern Trust has a duty to review its own account statements before issuing them to clients to ensure accuracy and detect fraud, he answered, "I don't know the answer to that," and testified that Northern Trust does not, to his knowledge, conduct such reviews. *Id.* at 213-14.

And then to top it off, Gregory Irizarry, Northern Trust's Managing Director of its wealth management team, was deposed on June 30, 2026. **Exhibit O**, Irizarry Dep. Tr. at 28. Mr. Irizarry answered "I don't know" 133 times. When questioned about the components of Northern Trust's fiduciary duty as corporate co-trustee, he stated he was "not familiar" with the duty of care, "not familiar with those terms either" when asked about a duty to act impartially, and "not familiar with account" when asked about a duty to account. *Id.* at 11. When asked whether there is a fiduciary duty of confidentiality, he said he was "not sure" and was unable to identify the circumstances under which client information could be shared with third parties. *Id.* at 13-17.

These depositions reveal the precise prejudice caused by Northern Trust's delayed production. On each subject, a Northern Trust witness professed a lack of knowledge while Northern Trust possessed written policies and records bearing directly on the witness's testimony. Yet Mrs. Madden could not place those materials before the witnesses, test their claimed ignorance against Northern Trust's own written standards, refresh their recollections, or examine whether

10

Northern Trust and its employees actually followed the controls the institution had adopted. The late production also prevented Mrs. Madden from exploring whether the witnesses' inability to answer reflected individual ignorance, inadequate training, a failure to enforce Northern Trust's policies, or a broader institutional breakdown that allowed Vice President Walters' fraud to continue undetected. Northern Trust instead obtained the benefit of incomplete testimony taken without the documents best suited to challenge it.

The parties exchanged expert reports on July 7, 2026. During discovery, Northern Trust had produced certain policies and procedures covering only select years. But Northern Trust's own expert witnesses were provided with additional years of those same documents. However, Northern Trust did not produce them to Mrs. Madden until July 14, 2026, one week *after* the expert reports were served. The result was a structurally uneven playing field: Northern Trust's expert was able to review and rely upon a more complete set of Northern Trust's own records than Mrs. Madden's experts were permitted to see when forming their opinions.

Only after several Northern Trust witnesses were no longer under examination and each expert's opinions formed did Northern Trust provide the materials that would have permitted meaningful follow-up. Producing the documents later did not restore the lost opportunity to confront the witnesses in real time and for the experts to have a complete record on which to base their opinions. It merely shifted to Mrs. Madden the burden and expense of deciding whether the depositions must be reopened to obtain testimony that should have been secured in the first instance and whether to incur the additional cost of paying her expert witnesses to review 1,691 pages and form new or different opinions.

**MEMORANDUM OF LAW**

a.      **Applicable Standards**

Federal Rule of Civil Procedure 30(b)(6) requires an organization to designate a witness who is prepared to testify about information known or reasonably available to it and the organization has an obligation to educate its designee as necessary. *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 689 (S.D. Fla. 2012) (Goodman, M.J.). Producing an unprepared Rule 30(b)(6) witness may be treated as a failure to appear and is sanctionable under Rule 37. *Kartagener v. Carnival Corp.*, 380 F. Supp. 3d 1290, 1297 (S.D. Fla. 2019) (Louis, M.J.); *QBE Ins.*, 277 F.R.D. at 690.

Rule 30(d)(2) also authorizes the Court to "impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." In addition, Rules 37(a)(5)(A) and 37(b)(2)(C) require an award of reasonable expenses caused by unjustified nondisclosure or noncompliance with a discovery order unless the conduct was substantially justified or other circumstances would make an award unjust. Rule 37 sanctions "are intended to 1) compensate the court and the parties for the added expenses caused by discovery abused, 2) compel discovery, 3) deter others from engaging in similar conduct, and 4) penalize the offending party or attorney." *Thornton v. Hosp. Mgmt. Assocs., Inc.*, 787 F. App'x 634, 638 (11th Cir. 2019) (cleaned up).

Beyond fee-shifting, Rule 37(b)(2)(A) authorizes the Court to enter "further just orders" when a party fails to obey a discovery order. Those orders may include directing that designated facts be taken as established, Fed. R. Civ. P. 37(b)(2)(A)(i), and prohibiting the disobedient party from supporting or opposing designated claims or defenses or introducing designated matters into evidence, Fed. R. Civ. P. 37(b)(2)(A)(ii). The sanction should be proportionate to the violation, cure the resulting prejudice, and eliminate any benefit obtained through noncompliance.

12

Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by[the discovery rules], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Those sanctions may include precluding the offending party's expert from relying on the late-disclosed evidence and shifting the resulting fees and costs. *See, e.g., Wilkerson v. Carnival Corp.*, 2025 WL 2845019, at \*18 (S.D. Fla. June 4, 2025) (Elfenbein, M.J.).

An adverse inference instruction may also be appropriate where loss or destruction of evidence was undertaken in bad faith, but only upon consideration of the following factors: "(1) whether the party seeking sanctions was prejudiced as a result of the destruction of evidence and whether any prejudice can be cured; (2) the practical importance of the evidence; (3) whether the spoliating party acted in bad faith; and (4) the potential for abuse if sanctions are not imposed." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (cleaned up).

### b.      Northern Trust Violated Rule 30(b)(6) and Judge Torres' Instructions

The Court ordered Northern Trust to produce a witness with "personal knowledge of the search" who could "vouch for it on behalf of Northern Trust." **Exhibit G**, Hr'g Tr. at 23-24. Northern Trust was required to "educate that person" so the witness could testify competently about the search for the missing records. *Id.* at 24.

Northern Trust did not comply. Mr. Kelleher was prepared on only three topics and unprepared to testify about the searches conducted, whether records had been destroyed, litigation holds, the personnel responsible for implementing retention policies, and other subjects directly related to the Court-ordered inquiry. He had not consulted Northern Trust's data-governance team, had only first reviewed the global records retention schedule the day before the deposition, and did not bring it with him. Someone from data-governance should have testified.

13

Northern Trust's objections to the scope of the notice do not excuse that failure. Rule 37(d)(2) provides that a failure to comply with deposition obligations "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order." Northern Trust had no such motion pending. Having chosen not to seek judicial relief, it could not unilaterally limit the topics on which its designee would prepare. *See Kartagener*, 380 F. Supp. 3d at 1296.

Northern Trust's failure prevented Mrs. Madden from obtaining the testimony the Court ordered and requires the deposition to be reconvened. Mrs. Madden is therefore entitled to the expenses incurred in connection with the July 14, 2026 deposition and any reconvened deposition. *See D.B.C. Corp. v. Nucita Venezolana, C.A.*, 2020 WL 8872095, at *2 (S.D. Fla. June 19, 2020) (Louis, M.J.) (ordering that defendants "bear the costs associated with the re-depositions").

### c.     Northern Trust's Objections Were Not Substantially Justified

A discovery position is substantially justified only when "reasonable people could differ as to the appropriateness of the contested action." *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 812 (11th Cir. 2017) (cleaned up). Northern Trust's position does not satisfy that standard. A party cannot invoke its retention policies as the affirmative reason evidence is unavailable while simultaneously refusing to disclose those policies as irrelevant "discovery about discovery." Once Northern Trust placed the policies at issue, Mrs. Madden was entitled to determine whether they existed as described, applied to the records at issue, had actually been followed, and had been suspended by a litigation hold. The deposition confirmed the importance of those inquiries. Mr. Kelleher identified discrepancies among Northern Trust's stated ten-year limitation, the seven-year policy, and the ten-year capacity of its wire system. Timely production of the retention materials could have revealed those matters months earlier and avoided much of the practice and deposition expense that followed.

14

**d.      Northern Trust's Belated Production Requires Fee-Shifting**

Rule 37(a)(5)(A) applies where requested discovery is provided only after court intervention. Northern Trust maintained its objections to RFP Nos. 64 and 80 through the June 4, 2026 hearing and did not produce its global records retention schedule until 6:42 p.m. on July 13, 2026, the night before the Court-ordered deposition. That was not voluntary or timely compliance; it was production prompted by the proceeding Mrs. Madden had been forced to obtain.

None of Rule 37(a)(5)(A)'s exceptions applies. Mrs. Madden conferred before seeking relief. Northern Trust's objection was not substantially justified. And no circumstance would make an award unjust. To deny expenses would allow Northern Trust to force court intervention, produce requested material only when the resulting deposition is imminent, and shift the entire cost of its delay to the requesting party, Mrs. Madden.

**e.      The Eve-of-Deposition Production Was Not Reasonably Usable**

Rule 34(b)(2)(E)(ii) requires electronically stored information to be produced in the form in which it is ordinarily maintained or in a reasonably usable form. "But the option to produce in a reasonably usable form does not mean that a responding party is free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation." Fed. R. Civ. P. 34 Advisory Committee Note to 2006 Amendment.

Northern Trust produced the sought-after data retention materials at 6:42 p.m. the night before the deposition in Relativity load-file format. Consequently, Mrs. Madden's counsel could not access them until the following morning, after the materials were extracted and uploaded to the Relativity system, and as a result, had no meaningful opportunity to analyze them before questioning Northern Trust's designee. The prejudice was compounded when Mr. Kelleher

15

repeatedly directed Mrs. Madden to those same materials while acknowledging that he could not answer most of the noticed topics.

This is not merely a complaint as to the format in which the data retention materials were produced. Rather, the issue is that the format, coupled with the timing of production, effectively deprived Mrs. Madden of a fair opportunity to use the central document at the deposition for which it was produced, and therefore warrants sanctions. *See In re Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 652 (M.D. Fla. 2007) (finding that the party's "failure to cooperate in the production of the databases and its failure to timely and systematically produce electronic discovery … in any manageable, searchable form are sanctionable conduct").

### f.       Northern Trust's Pattern of Late Production Appears Strategic and Prejudicial to Mrs. Madden

Viewed as a whole, Northern Trust's conduct permits only one reasonable inference: the timing was strategic. The data retention documents requested in March were produced after business hours on the night before the court-ordered deposition. Fiduciary policies, fraud detection procedures, employee handbooks, mandatory leave records, and Vice President Walters' time-off records were produced on the day of that deposition, but only after the witnesses most relevant to those documents had already testified.

The timing was not incidental. Northern Trust repeatedly refused to search for or produce responsive materials, allowed its witnesses to testify without them, and then produced the materials only after the examinations were complete. The practical consequence was severe. Mrs. Madden's counsel prepared for and conducted depositions without the records necessary to test the witnesses' testimony. Timely production would have allowed her counsel to confront the witnesses with Northern Trust's written policies, test the accuracy of their answers, refresh their recollections, explore whether Northern Trust followed its own controls, and determine whether the witnesses'

professed ignorance was personal or institutional. Northern Trust deprived Mrs. Madden of each of those opportunities.

The resulting prejudice extends beyond the expense of the original depositions. This Court placed the case on an accelerated track following Mrs. Madden's presentation of her advanced age and health; time to her is uniquely consequential. Northern Trust knew[3] that the expedited schedule was intended to protect Mrs. Madden's ability to participate meaningfully in the case and, if successful, obtain relief during her lifetime. Reopening depositions would impose additional expenses and consume time within a case the Court expedited because delay itself threatens Mrs. Madden's ability to obtain effective relief. On the other hand, forgoing further examinations would leave Northern Trust with the benefit of an incomplete record it created while the relevant documents remained withheld. Northern Trust should not benefit from either alternative.

Northern Trust cannot be permitted to benefit from a dilemma of its own making. Its misconduct should not result in an extension of the trial or otherwise frustrate the purpose of the Court's expedited schedule. Reopening the completed individual fact-witness depositions is not a meaningful or proportionate cure. It would impose additional expense on Mrs. Madden, consume the limited time remaining in the expedited schedule, and allow Northern Trust to prepare its witnesses using materials it withheld during their original examinations. Rather, the proportionate remedy is evidentiary preclusion. Northern Trust, its witnesses, and its experts should be prohibited

---

[3] Northern Trust consumed a significant portion of the expedited discovery period before producing any documents. Despite the fact that Northern Trust knew by March 12, 2026 that Mrs. Madden did not believe that a protective order was necessary, *see* ECF No. 17 at 5, Northern Trust slow-played this issue by waiting until April 6, 2026 (the day it served its objections to Mrs. Madden's First RFP) to say it would not produce responsive documents until the entry of a protective order. This issue was later heard at the April 23, 2026 discovery hearing, wherein Judge Torres partially denied Northern Trust's requested relief. Notwithstanding, Northern Trust then failed to submit a copy of the proposed protective order pursuant to the CM/ECF procedures, which delayed entry of the protective order by several weeks and in turn further delayed discovery.

from relying on the materials first produced on July 13 and 14, 2026, on motion, at a hearing, or at trial. That prohibition should also preclude Northern Trust from using those materials for the purpose of contradicting, supplementing, explaining, or rehabilitating the testimony already given by its fact witnesses.

> **g.     Sanctions Should Be Assessed Against Northern Trust, Its Counsel, or Both.**

Northern Trust made "discovery about discovery" objections, resisted the noticed deposition without seeking a protective order, produced the retention schedule in an unusable manner on the eve of the deposition, presenting an inadequately prepared Rule 30(b)(6) designee, and withheld responsive corporate records until after key witnesses had already testified. Because that conduct involved both Northern Trust's institutional preparation and the discovery positions advanced by its counsel, Mrs. Madden requests that the Court assess the award against Northern Trust, its counsel, or both, as the evidence warrants. *Procaps S.A. v. Patheon Inc.*, 2015 WL 4430955, at \*12 (S.D. Fla. July 20, 2015) (Goodman, M.J.).

> **h.     Monetary Sanctions Alone Cannot Cure the Prejudice**

An award of discovery expenses, standing alone, would miss the central problem. Mrs. Madden seeks tens of millions of dollars. If Northern Trust may consume a substantial portion of the expedited discovery period by withholding evidence, producing unprepared witnesses, and forcing depositions to be repeated, the prospect of paying a comparatively modest discovery sanction provides neither an adequate remedy nor a meaningful deterrent. Northern Trust would retain the far more valuable benefit of the time it consumed and the incomplete evidentiary record its conduct created.

The circumstances warrant an adverse inference instruction concerning the records Northern Trust claims are unavailable, which are central to determining the duration and extent of the misconduct. Their absence substantially prejudices Mrs. Madden's ability to prove her claims.

18

Northern Trust repeatedly invoked its retention practices to explain their absence yet resisted discovery into those practices and then produced a designee who could not identify the searches performed, determine whether or when records were destroyed, explain the implementation of any litigation hold, or identify the personnel responsible for applying the relevant policies. Meanwhile, the limited testimony Northern Trust did provide revealed discrepancies between its prior representations, its written retention policies, and the capacity of its own systems.

That sequence supports an inference of bad faith. Northern Trust possessed exclusive control over the missing records and the information necessary to explain what happened to them. Rather than provide that information, it withheld the governing policies, resisted inquiry into the purported destruction, and failed to prepare the witness the Court ordered it to produce. . The missing records are highly important, the prejudice from their loss cannot be fully cured, and permitting Northern Trust to rely on their absence without consequence would reward the very obstruction that prevented Mrs. Madden from determining whether they were properly destroyed. Those considerations therefore support an instruction permitting the jury to infer that the records Northern Trust failed to preserve would have contained information unfavorable to Northern Trust. *See Tesoriero*, 965 F.3d at 1184.

Separate expert-related relief is necessary to address the documents Northern Trust produced late but did not lose. Northern Trust produced policies and procedures sought in the Frist Request for Production only after relevant depositions had occurred and rebuttal expert deadlines were approaching. Northern Trust should not be permitted to use those materials, or the evidentiary vacuum created by withholding them, through its experts after Mrs. Madden's experts were required to formulate their opinions without them.

## CONCLUSION

For the foregoing reasons, Mrs. Madden requests that this Court grant this motion and

19

1. Award Mrs. Madden her reasonable expenses caused by Northern Trust's discovery misconduct, including all attorneys' fees and costs associated with the June 4, 2026 hearing, the July 14, 2026 deposition, and the preparation and filing of this motion;

(1) Order that Northern Trust produce a Rule 30(b)(6) designee to reconvene the data retention deposition at Northern Trust's expense, with full preparation on all eleven noticed topics;

(2) Preclude Northern Trust, its witnesses, and its experts from relying on the June 13 and 14, 2026 belatedly produced materials, or offering opinions derived from those materials;

(3) Strike those portions of Northern Trust's expert report(s) that relied upon or were otherwise informed by the June 13 and 14, 2026 belatedly produced materials; and

(4) Instruct the jury that it may infer that the records Northern Trust failed to preserve would have contained information unfavorable to Northern Trust.

### CERTIFICATION UNDER S.D. FLA. L.R. 7.1(A)(3) & FED. R. CIV. P. 37

Pursuant to S.D. Fla. 7.1(a)(3) and Fed. R. Civ. P. 37(a)(1), undersigned certify that counsel for the movant has conferred with all parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

Dated:  July 23, 2026

*s/ Lee Stapleton*
Lee Stapleton (FBN 356778)
Email:  lstapleton@carltonfields.com
Aaron Weiss (FBN 48813)
Email:  aweiss@carltonfields.com
Amy Furness (FBN 34355)
Carlton Fields, P.A.
Email:  afurness@carltonfields.com
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Telephone: 305-530-0050

*Attorneys for Plaintiff Elizabeth Madden*

20